IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

TRAVIS CLINTON HITTSON,             :
                                    :
            Petitioner,             :
                                    :
    vs.                             :
                                    :   CIVIL ACTION NO. 5:01-CV-384 (MTT)
CARL HUMPHREY, Warden,              :
                                    :
            Respondent.             :
                                    :
_____    :

## ORDER

**TRAVIS CLINTON HITTSON** petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.   Hittson, then a United States sailor, brutally murdered and dismembered his shipmate.   A jury concluded that Hittson should die.   Hittson does not deny his guilt, but he claims that, but for suppressed evidence, trial court errors, and ineffective assistance of counsel, that jury would not have sentenced him to die.

Two rather unusual factors merit mention at the outset.   First, the history of this case in the Georgia state courts has been unusual.   All agree that the Georgia Supreme Court wrongly decided a key issue Hittson raised in his direct appeal.   In a subsequent case, the Georgia Supreme Court acknowledged its error and overruled itself.   The remaining key issues were resolved in an order entered by a Georgia trial court sitting in habeas review.   That order, which was drafted by counsel for the Respondent and the merits of which were not reviewed by the Georgia Supreme Court, contains many factual and legal errors.   The extent and significance of these errors are discussed below.

Second, Hittson's codefendant, Edward Vollmer, was far more culpable than Hittson.   Yet, Vollmer, as the result of a plea bargain, received a life sentence and is eligible for

parole.   The State, thus far successful in its efforts to deny parole, has summarized the

difference between Hittson and Vollmer:

> In February, 1993, Travis Hittson was tried, convicted and sentenced to death
> for his participation in the murder.   In October of that year, Vollmer entered a
> plea of guilty to murder and was sentenced to life imprisonment.   Although he
> received the "lesser" sentence, it is evident from the information received in
> the investigation that Vollmer was the instigator in the murder, that he
> convinced Hittson to do it, that the manner of disposing of the body was
> Vollmer's idea, and that Vollmer is, in a word, EVIL!   As you consider the
> following material, you will be able to see that this inmate has a perverted mind
> and has no capacity for remorse.   Not only does the heinous nature of the
> crime warrant his remaining in prison, but the fact that he is clearly incorrigible
> and would be extremely dangerous if ever released back into society.

(Doc. 56-13 at 114-15).[1]   Hittson's lawyers strongly decry this apparent disparity in

punishment.[2]   That argument, whatever its practical appeal, has no legal relevance to the

issues before this Court.   Although Vollmer's role in the murder and his manipulation of

Hittson are factors relevant to several of the issues Hittson raises, the fact that Vollmer does

not face death is not.   The "fairness" of Hittson's death sentence in relation to Vollmer's life

sentence is not before this Court.

For the reasons discussed below, Hittson's petition is **GRANTED IN PART and

DENIED IN PART**.

## I.   BACKGROUND AND PROCEDURAL HISTORY

### A.  Facts

The Georgia Supreme Court summarized the facts of this case in Hittson's direct

appeal:

---

[1] Because all documents have been electronically filed, this Order cites to the record by using the document
number and electronic screen page shown at the top of each page by the Court's CM/ECF software rather than
the sometimes illegible Bates numbers affixed many years ago.

[2] For various reasons, the State faced hurdles in Vollmer's prosecution that it did not face in Hittson's.   For
example, Hittson readily confessed and cooperated with authorities, while Vollmer, consistent with his "evil"
and "manipulative" personality, schemed even as he awaited trial.

On April 3, 1992 Hittson, his co-defendant Edward Vollmer, and the victim, Conway Utterbeck, left Pensacola, Florida, where they were stationed on the U.S.S. Forrestal, and they drove to the home of Vollmer's parents in Warner Robins, Georgia. The elder Vollmers were out of town, and the three men spent the first night in a shed on the property. They obtained a key to the house from a family friend the following day. According to statements Hittson subsequently made to law enforcement officers, on the second day of the trip he and Vollmer went to several bars, leaving the victim at the Vollmers' home. As they drove back to the house, Vollmer stated that the victim planned to kill them, and they should "get" him first. Vollmer gave Hittson an aluminum baseball bat and the two entered the house to find the victim dozing. Hittson stated that, at Vollmer's direction, he struck the victim several times in the head with the baseball bat, then dragged him into the kitchen where Vollmer waited. According to Hittson, the victim screamed, "Travis, whatever have I did to you?" While Vollmer stepped on the victim's hand, Hittson shot him in the head. Hittson stated that he was "cold" and "had no emotion" when he shot the victim.

According to Hittson's statement, approximately two hours later Vollmer stated that they needed to dismember the body in order to get rid of the evidence. Hittson stated that they used a hacksaw to remove the victim's hands, head and feet, but that he became sick after he removed a hand, and Vollmer completed the dismemberment. Hittson stated that Vollmer acted alone in removing the victim's genitals and carving out his rectum. Vollmer and Hittson then packed the victim's remains in numerous garbage bags. They buried the victim's torso in Houston County, cleaned up the Vollmers' home, and hid the baseball bat in the Vollmers' shed. Subsequently they drove back to Pensacola where they buried the rest of the victim's remains.

On April 5, 1992, Louise Davidson observed a black Thunderbird with Florida license plates emerging from a seldom used dirt road in Houston County. Two people were in the car. Suspicions were aroused, and she noted the license number. When the victim's torso was discovered two months later by loggers in an area off the same dirt road, police determined that the car previously observed by Davidson belonged to Edward Vollmer.

Relying on information that the victim had gone to Warner Robins just before his disappearance, the Navy contacted the Houston County Sheriff's Department. Representatives of the Sheriff's Department travelled to Pensacola, Florida, and, along with agents from the Naval Investigative Service (NIS), interviewed a number of the victim's shipmates, including Hittson. Hittson subsequently confessed and gave information leading to the discovery of the rest of the victim's remains.

At Hittson's trial the medical examiner testified that, in his opinion, the victim died from a single gunshot wound to the head, but that it was not possible to determine whether the dismemberment occurred before or after death.

*Hittson v. State*, 264 Ga. 682, 682-83, 449 S.E.2d 586, 590-91 (1994), *overruled in part by Nance v. State*, 272 Ga. 217, 526 S.E.2d 560 (2000).

## B. Procedural History

On February 27, 1993, a jury found Hittson guilty of malice murder, aggravated assault, possession of a firearm during the commission of a crime, and theft by taking. (Doc. 70-4 at 14).   He was sentenced to death for the crime of malice murder and the Georgia Supreme Court affirmed his conviction and sentence on October 31, 1994.   (Doc. 70-5 at 25, 29-32); *Hittson,* 264 Ga. at 682-91, 449 S.E.2d at 590-96.

Hittson filed a Petition for Writ of Habeas Corpus in the Superior Court of Butts County, Georgia on December 31, 1995 ("first state habeas").   (Doc. 75-13).   After conducting an evidentiary hearing, the first state habeas court denied relief on July 10, 1998. (Docs. 75-16 to 75-21; Doc. 76-4).

On January 4, 2002, Hittson filed in this Court a Petition for Writ of Habeas Corpus by a Person in State Custody.   (Doc. 6).   The Court granted Hittson's request for discovery of the Houston County District Attorney's file so he could determine if the State had withheld certain evidence.   (Doc. 22).   When Hittson discovered what he claimed was suppressed evidence, he moved to stay federal court proceedings.   (Doc. 27 ).   On August 30, 2004, this Court stayed his habeas corpus action to allow Hittson to return to state court and exhaust his *Brady* claims.   (Doc. 35).

Hittson filed a Petition for Writ of Habeas Corpus in the Superior Court of Butts County ("second state habeas").   (Docs. 55-1 to 55-3).   After being ordered to do so by the Georgia Supreme Court, the second state habeas court held an evidentiary hearing on

-4-

November 29 and 30, 2007.   (Doc. 55-9; Docs. 56-9 to 62-11).   On January 26, 2009, the second state habeas court denied Hittson's petition.   (Doc. 63-1).

Following denial of his Application for Certificate of Probable Cause to Appeal and Petition for Writ of Certiorari, Hittson filed his Amended Petition for Writ of Habeas Corpus by a Person in State Custody in this Court on July 11, 2011.   (Docs. 63-3 to 63-9; Doc. 45); *Hittson v. Humphrey*, 131 S. Ct. 3038 (2011).   The Respondent has filed his answer and both parties have now briefed the issues.   (Doc. 54; Docs. 82 to 84).

## II.   STANDARD OF REVIEW

Because Hittson filed his federal habeas corpus petition in 2002, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides the standard of review.

### A. Exhaustion and procedural default

Procedural default bars federal habeas relief when a habeas petitioner has failed to exhaust state remedies that are no longer available and when the state court rejects the habeas petitioner's claim on independent state procedural grounds.   *Ward v. Hall,* 592 F.3d 1144, 1156-57 (2010); *Frazier v. Bouchard,* 661 F.3d 519, 524 n.7 (11th Cir. 2011).

There are exceptions to procedural default.   If the habeas respondent establishes that a default has occurred, the petitioner bears the burden of establishing "cause for the failure to properly present the claim and actual prejudice, or that the failure to consider the claim would result in a fundamental miscarriage of justice."   *Conner v. Hall*, 645 F.3d 1277, 1287 (11th Cir. 2011) (citing *Wainwright v. Sykes*, 433 U.S. 72, at 81-88 (1977); *Marek v. Singletary*, 62 F.3d 1295, 1301-02 (11th Cir. 1995)).   "'To establish "cause" for procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court.'"   *Spencer v. Sec'y, Dep't of Corr.*, 609 F.3d 1170, 1180 (11th Cir. 2010) (quoting *Henderson v. Campbell*, 353 F.3d 880,

892 (11th Cir. 2003)).   "'To establish "prejudice," a petitioner must show that there is at least

a reasonable probability that the result of the proceeding would have been different.'"   *Id.* at

1180 (quoting *Henderson*, 353 F.3d at 892).   To the extent the state court's cause and

prejudice findings are based upon determinations of fact, and they typically will be, those

factual findings are presumed to be correct and can be rebutted only by clear and convincing

evidence.   28 U.S.C. § 2254.

### B. Claims that were adjudicated on the merits in the state courts

Pursuant to 28 U.S.C. § 2254(d), this Court may not grant habeas relief with respect

to any claim that has been adjudicated on the merits in state court unless the state court's

decision was (1) "contrary to ... clearly established Federal law;" or (2) "involved an

unreasonable application of ... clearly established Federal law" or (3) "was based on an

unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."   28 U.S.C. § 2254(d)(1)-(2); *see also Harrington v. Richter*,   131 S. Ct. 770,

785 (2011).   The phrase "clearly established Federal law" used in § 2254(d)(1) refers to

only the holdings, not the dicta, of the United States Supreme Court in existence at the time

of the relevant state court decision.   *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Thaler v.*

*Haynes*, 130 S. Ct. 1171, 1173 (2010).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are

separate bases for reviewing a state court's decisions.   *Fotopoulos v. Sec'y, Dep't of*

*Corr.,* 516 F.3d 1229, 1232 (11th Cir. 2008) (quoting *Putman v. Head*, 268 F.3d 1223, 1241

(11th Cir. 2001)).

> Under § 2254(d)(1), [a] state court's decision is 'contrary to' ... clearly
> established law if it 'applies a rule that contradicts the governing law set forth in
> [the United States Supreme Court's] cases' or if it 'confronts a set of facts that
> are materially indistinguishable from a decision of [the United States Supreme]
> Court and nevertheless arrives at a [different] result....'"

*Michael v. Crosby,* 430 F.3d 1310, 1319 (11th Cir. 2005)(quoting *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003)).

A state court's decision involves an "unreasonable application" of federal law when "'the state court identifies the correct governing legal rule but unreasonably applies it to the facts of the particular state prisoner's case, or when it unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context.'" *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1286 (11th Cir. 2012) (quoting *Greene v. Upton*, 644 F.3d 1145, 1154 (11th Cir. 2011)).   An "unreasonable application" and an "incorrect application" are not the same:

> We have explained that an *unreasonable* application of federal law is different from an *incorrect* application of federal law. Indeed, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.   Rather, that application must be objectively unreasonable.   This distinction creates a substantially higher threshold for obtaining relief than *de novo* review. AEDPA thus imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt.

*Hill v. Humphrey*, 662 F.3d 1335, 1344-45 (11th Cir. 2011) (quoting *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010)(emphasis in original)).

With regard to a state court's determination of factual issues, that determination is "presumed to be correct" and this presumption can only be rebutted by "clear and convincing evidence."   28 U.S.C. § 2254(e)(1).   "We therefore grant habeas relief to a petitioner challenging a state court's factual findings only in those cases where the state court's decision 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"   *Price v. Allen*, 679 F.3d 1315, 1320 (11th Cir. 2012) (quoting 28 U.S.C. § 2254(d)(2)); *but see Cave v. Sec'y for the Dep't. of. Corr.,* 638 F.3d 739, 746 (11th Cir. 2011) (noting the uncertainty regarding the interaction between

§ 2254(d)(2) and § 2254(e)(1)).

## C. The Relevant State Court Orders and AEDPA Deference

The Respondent argues this Court must give AEDPA's near total deference to three state court orders.   The first is the Georgia Supreme Court's decision in Hittson's direct appeal.   *Hittson v. State,* 264 Ga. 682, 449 S.E.2d 586 (1994).   That decision was partially overruled by *Nance v. State,* 272 Ga. 217, 526 S.E.2d 560 (2000).   The second is the superior court order denying relief in Hittson's first state court habeas action.   (Doc. 76-4).  The third is the January 26, 2009, superior court order in Hittson's second state habeas action.[3]   (Doc. 63-1).

Hittson contends that the second state habeas court's order is "not an adjudication worthy of the deference typically given to state court findings" because the court simply signed the proposed order submitted by the Respondent's counsel.   (Doc. 82 at 19, 21, 22).  He also alleges the presiding judge routinely adopts verbatim orders prepared by respondents in capital habeas corpus cases.[4]   (Doc. 82 at 19-23).   Hittson argues that

---

[3]  In both state habeas actions, the Georgia Supreme Court denied Hittson's applications for certificate of probable cause to appeal.   (Doc. 76-9; Doc. 63-5).

[4]  The specifics of this allegation are contained in Footnote 12 of Hittson's brief in support of his petition:   "In addition to RX 68 (10-page Order of October 7, 2005, dismissing the petition, authored by Assistant Attorney General John Taylor ) and RX 143 (52-page Order of January 30, 2009, denying petition, authored by Assistant Attorney General Sabrina Graham, with Ms. Graham's signature still appended to the final order), *see James Willie Brown v. Head*, 2002-V-868 (Superior Court of Butts County, Georgia) (final order denying relief of June 3, 2003, titled 'Respondent's Proposed Order Denying Relief' [sic], with the signatures of *both* Senior Assistant Attorney General Susan V. Boleyn *and* Judge Thomas Wilson on the final page, and with Ms. Boleyn's service of proposed order page still appended to the final court's order); *Jimmy Fletcher Meders v. Upton*, 2007-V-751 (Superior Court of Butts County, Georgia)(88-page final order denying relief of December 16, 2009, authored by Assistant Attorney General Sabrina Graham, with Ms. Graham's signature still appended to the final order); *Brandon Joseph Rhode*, 2010-V-1023 (Superior Court of Butts County, Georgia)(14-page final order denying relief of September 24, 2010, authored by Beth Burton).   In response to the objections lodged by Mr. Rhode the previous day to the court's use of proposed orders, Ms. Burton included for Judge Wilson the following assurance on the face of the order:   'The Court gave serious consideration to all of the proposed findings of fact and conclusions of law submitted by the parties in their draft orders while at the same time independently researching cases for the most current statements of the precise state of the law on the numerous legal arguments raised.   The Court declines to allow either party's proposed order to substitute for the Court's own research on the law and facts of the case and deliberation on the issues presented by the habeas petition.   As such, the Court hereby finds as follows ... [text of order].   Prepared by: Beth A. Burton.'"

"[t]he judgment of such a court could not possibly qualify as an 'adjudication' [on the merits] to be deferred to by this Court for purposes of 2254(d)."   (Doc. 82 at 20).

Hittson's argument has some appeal.   Given AEDPA's broad deference to state court rulings, it seems particularly important that those rulings be the product of independent judicial review.   Yet, for all but one of the key issues in Hittson's petition for writ of habeas corpus, the only court of review, and the court to which this Court must give near total deference, adopted verbatim an order prepared by attorneys for the Respondent, which they submitted approximately thirteen months after the evidentiary hearing.   This order, which still has attached to it the certificate of service affixed by the Respondent's attorneys when they submitted the order, contains significant errors, some of which the Respondent admits. [5]   Nevertheless, Hittson's argument that the second state habeas court's order in its entirety is not worthy of deference faces significant obstacles.

Although criticizing the practice, the United States Supreme Court has held that "even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous."   *Anderson v. Bessemer City*, 470 U.S. 564, 572 (1985) (citing *United States v. Marine Bancorporation*, 418 U.S. 602, 615 n.13 (1974); *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656-57 (1964)).   The Eleventh Circuit has "consistently upheld the use of such orders as long as they were adopted after adequate evidentiary proceedings and are fully supported by the evidence."   *Brownlee v. Haley*, 306 F.3d 1043, 1067 n.19 (11th Cir. 2002).   In a fairly recent capital habeas corpus case, the petitioner also complained "that the state habeas court adopted verbatim the State's proposed order."   *Rhode v. Hall*, 582 F.3d 1273, 1281 (11th Cir. 2009) (The state

---

[5] This Court is not unmindful of the tremendous burdens placed on Georgia's superior court judges and the relatively meager resources available to them.   The Court notes, however, that the first state habeas court did not adopt proposed findings of facts and conclusions of law, but rather crafted its own order.   The contrast between that order and the order drafted by the Respondent for the second state habeas court is stark.

habeas judge in *Rhode* was also the presiding judge in Hittson's second state habeas action.).   The Eleventh Circuit concluded that "[d]espite the fact that the state habeas court adopted the State's facts verbatim, these findings of fact are still entitled to deference from this court unless Rhode can show the facts to be clearly erroneous."   *Id.* at 1282.

Hittson relies on *Jefferson v. Upton*, 130 S. Ct. 2217 (2010), a pre-AEDPA case. There, the state habeas judge contacted the attorneys for the Respondent ex parte and requested that they "draft the opinion of the court."   *Id.* at 2219.   Jefferson's counsel knew nothing of this request, and he was never asked to draft a proposed order.   The state habeas court then adopted verbatim the Respondent's proposed order even though it "recounted evidence from a nonexistent witness."   *Id.* at 2222.

During his federal habeas proceedings, Jefferson argued that the district court should not have afforded any deference to the state court's opinion.   The pre-AEDPA version of 28 U.S.C. § 2254(d) governed, and thus, if any of the eight enumerated exceptions contained in the prior law applied, the state court's factfinding was not entitled to a presumption of correctness.   *Id.* at 2221.   Addressing the ghost-written opinion, the Supreme Court stated:

> Although we have stated that a court's "verbatim adoption of findings of fact prepared by prevailing parties" should be treated as findings of the court, we have also criticized that practice. And we have not considered the lawfulness of, nor the application of the habeas statute to, the use of such a practice where (1) a judge solicits the proposed findings *ex parte*, (2) does not provide the opposing party an opportunity to criticize the findings or to submit his own, or (3) adopts findings that contain internal evidence suggesting that the judge may not have read them.

*Id.* at 2223 (quoting *Anderson*, 470 U.S. at 572); Ga. Code of Judicial Conduct, Canon 3(A)(4) (1993).   The Supreme Court concluded the Eleventh Circuit had erred by presuming the state court's factfinding to be correct without considering all eight statutory exceptions and remanded for a determination of whether the state court's factual findings warranted a presumption of correctness.   *Id.*

Here, the second state habeas court did not act ex parte.   Hittson also submitted a proposed order, which arguably was as one-sided as that submitted by the Respondent.[6] However, as the Respondent repeatedly notes, Hittson's lawyers refused to submit a post-hearing brief.   (Doc. 62-15 to Doc. 62-23).   Of course, if a court is simply going to sign off on one party's order or the other, the need for briefing is debatable.   Still, the relevant point is that Hittson had an opportunity to criticize the Respondent's proposed order.

Hittson suggests though that the second state habeas court may have signed the Respondent's proposed order without reading it.   It is hardly surprising that the Supreme Court in *Jefferson* acknowledged that a habeas court's adoption of "findings that contain internal evidence suggesting that the judge may not have read them" could be problematic. *Jefferson,* 130 S. Ct. at 2223.   How could a state court order be an adjudication of a petitioner's claims if the judge never read the order?   Put a slightly different way, when a party-drafted order is replete with misstatements of law and other mistakes, and a judge signs off on the order without even removing the lawyer's certificate of service, can a reviewing court have any confidence that the court read the order and that it is a product of independent judicial review?

As troubling as these issues are, Hittson cites no authority holding that a mistake-laden party-drafted order is not an adjudication contemplated by 28 U.S.C. § 2254.[7] Nor is there sufficient evidence here to establish that the second state habeas court did not read the order it signed.   Accordingly, this Court rejects Hittson's argument that the second state habeas court order is not entitled to AEDPA deference.

---

[6] This is not a criticism.   Lawyers are advocates and lawyer-drafted orders can be expected to be skewed. So long as proposed orders serve as the starting point, rather than the ending point, of judicial analysis, they serve a proper function.

[7] *See Gill v. Mecusker*, 633 F.3d 1272, 1292 ("Nothing in the language of AEDPA required the district court to evaluate or rely upon the correctness [of] the state court's process of reasoning.").

## III.   HITTSON'S CLAIMS[8]

### A.  The *Brady* Claims

This Court granted Hittson's motion to stay federal proceedings so he could return to

state court to exhaust his *Brady* claims involving (1) a Navy psychiatric report diagnosing

codefendant Edward Vollmer with antisocial personality disorder before Utterbeck's murder

("Vollmer's psychiatric report"); and (2) letters written by Vollmer after his arrest discussing

the State's investigation ("Vollmer's post-arrest letters").   In his second state habeas

petition, Hittson raised a third *Brady* claim – the State failed to disclose the names of, and

information given by, three witnesses ("three witnesses *Brady* claim").   (Doc. 55-1 at

50-53).

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held "the suppression

by the prosecution of evidence favorable to an accused ... violates due process where the

evidence is material either to guilt or to punishment."   *Id.* at 87.   A *Brady* violation has three

components:   "[1] The evidence at issue must be favorable to the accused, either because

it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed

by the State, either willfully or inadvertently; and [3] prejudice must have ensued."   *Strickler

v. Greene*, 527 U.S. 263, 281-82 (1999).   The prejudice prong is satisfied if "there is a

---

[8]  Hittson initially submitted a brief consisting of 161 pages, and later filed a reply brief consisting of 33 pages.
(Docs. 82, 84).   He states that his briefs "focus on the primary claims before this Court" and that he "does not
abandon any claims not ... addressed [in his briefs], but relies instead on factual and legal arguments contained
in the petition itself, his subsequent Reply to Respondent's Answer-Response, and in briefing before the state
courts ...."   (Doc. 82 at 7-8).   This Court addresses in detail only those claims which Hittson addresses in his
two briefs.   In the August 17, 2011, Scheduling Order, Hittson was instructed to "file a brief addressing all
claims raised in his Amended Petition and all arguments relating to those claims."   (Doc. 67).   The Court
specifically warned that "[a]ny issue or argument not raised shall be considered abandoned."   (Doc. 67).   "It
did so because mere recitation in a petition, unaccompanied by argument, in effect forces a judge to research
and thus develop supporting arguments—hence litigate—on a petitioner's behalf.   Federal judges cannot
litigate on behalf of the parties before them, and it is for this reason that any claims in [Hittson's] petition that
were nor argued in his brief are abandoned."   *Blankenship v. Terry*, 2007 WL 4404972 at *40 (S.D. Ga.), *aff'd*
542 F.3d 1253 (11th Cir. 2008) (citing *United States v. Burkhalter*, 966 F. Supp. 1223, 1225 n.4 (S. D. Ga.
1997); *GJR Investments, Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1369 (11th Cir. 1989)).

reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). The Court must "'evaluate the tendency and force of the undisclosed evidence item by item; there is no other way.'"  *Kyles v. Whitley*, 514 U.S. 419, 436-37 n.10 (1995).   Then, the Court must make a determination about the "cumulative effect."  *Id.*

There is a near complete overlap between cause and prejudice analysis and *Brady* analysis.   A petitioner who establishes cause by demonstrating that the State's suppression of the evidence prevented him from raising his *Brady* claim earlier will generally have also satisfied *Brady*'s second prong – suppression.   *Strickler*, 527 U.S. at 281-82.[9]  Similarly, the prejudice necessary to overcome procedural default mirrors *Brady*'s materiality requirement.   *Id.*   Thus, if the suppressed evidence is favorable to the petitioner, a petitioner who "succeeds in demonstrating 'cause and prejudice,' … will at the same time succeed in establishing the elements of his … *Brady* death penalty due process claim." *Banks v. Dretke*, 540 U.S. 668, 691 (2004).   Consequently, it is not unusual for courts to combine their procedural default and *Brady* analyses.

However, combining completely this Court's review of Hittson's *Brady* claims is not appropriate, primarily because the second state habeas court did not combine its procedural default and *Brady* analyses.[10]   Accordingly, this Court will first address the issues of cause

---

[9] As discussed below, and peculiar to the facts here, it is the overlap between cause and suppression that is not quite a complete overlap.   Suppression in the literal sense, i.e., concealment, can be sufficient to establish cause.   A petitioner cannot assert a *Brady* claim if he does not know the State concealed evidence. However, even if there has been literal suppression, a petitioner cannot satisfy *Brady*'s second prong if he could have gotten the concealed evidence from another source.   *Maharaj v. Sec'y for the Dep't of Corr.*, 432 F.3d 1292, 1315 (11th Cir. 2005).

[10] Normally, when a state court rules in the alternative, finding both a procedural default and addressing the merits of a claim, as the second state habeas court did with Hittson's *Brady* claims, this Court should apply the procedural bar and decline to reach the merits of the claim.   *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Richardson v. Thigpen*, 883 F.2d 895, 898 (11th Cir. 1989).   However, due to the overlap between cause and

and suppression with regard to Vollmer's psychiatric report.   The Court will then discuss briefly the suppression of Vollmer's post-arrest letters.   After which, the Court will address the issues of prejudice and materiality with regard to both Vollmer's psychiatric report and post-arrest letters.   The three witnesses *Brady* claim requires little discussion, and is addressed last.

### 1.   The Suppression of Vollmer's Psychiatric Report

Long after Hittson's trial, his lawyers found Vollmer's psychiatric report in the State's files.   Hittson claims this suppressed evidence was critical to his mitigation theory.

### a.   Trial Counsel's Efforts to Obtain *Brady* Material

On October 23, 1992, trial counsel filed their first *Brady* motion.   (Doc. 70-1 at 53-60).   The State first provided discovery on January 11, 1993, when it produced a copy of the indictment, a witness list, "scientific reports" relating to Utterbeck's autopsy, along with some of Utterbeck's medical records.   (Doc. 70-1 at 72-110).   At a January 13, 1993, status conference, the State announced that not all discovery had been produced but "at some point in time we're going to have to give the court and will give the court our file to look at, of course, we submit, there's nothing in there that's exculpatory in the least."   (Doc. 72-4 at 30).   At a January 20, 1993, status conference, the trial court announced that the State had delivered to the court the State's "original file pursuant to *Brady* along with a copy to be maintained and made part of the record."   (Doc. 72-6 at 5).   The trial judge informed trial counsel that he and his law clerk were reviewing the file.   At an ex parte hearing with Hittson's lawyers immediately following that status conference, the court, responding to a

---

prejudice and the underlying *Brady* claims as well as the manner in which the second state habeas court handled the claims, this Court discusses both.

question from trial counsel, said the State had not produced Vollmer's file.   (Doc. 72-7 at 28-29).   Trial counsel informed the Court they would be requesting an in-camera inspection of the State's file on Vollmer as well.   (Doc. 72-7 at 29).

On January 25, 1993, the State produced a supplemental witness list, Hittson's in custody statements, and two pages of medical records revealing Utterbeck's and Vollmer's blood types.   (Doc. 70-2 at 41-75).

On January 26, 1993, trial counsel filed a supplemental motion requesting disclosure of any "report ... which yields any information pertaining to the mental, emotional, or psychologcal (sic) state or competency of co-indictee, Edward Paul Vollmer."   (Doc. 70-2 at 85).   Counsel also sought Vollmer's Naval Service Record, including "the results of each and every psychological test or evaluation ... tending to show his propensity for aberrant conduct or behavior."   (Doc. 70-2 at 86).

At a status conference that same day, the District Attorney acknowledged this supplemental motion and said he had already complied with that *Brady* request because he had submitted his "file" to the court.   (Doc. 72-9 at 11).   With regard to evidence of mitigation, the District Attorney said he knew of none.   (Doc. 72-9 at 14-15).   At an ex parte conference following that hearing, trial counsel expressed concern that the State was not discharging its *Brady* obligations.   They informed the trial court that two lawyers representing a potential witness had told trial counsel they had given the State two letters written by Vollmer before Utterbeck's murder, the contents of which would support their mitigation theory.[11]   Defense counsel made clear what their theory was:

---

[11] These are not the letters Vollmer wrote after Utterbeck's murder and which are the subject of Hittson's second *Brady* claim.

[O]ur theory will be you've got one person ... who's evil and one person who has a low intelligence and is mentally ill; who is the more culpable person? And so those letters ... would be enormously exculpatory with regard to mitigation and should be discoverable under *Brady*.   But I believe that ... in the file that [the District Attorney] turned over to the Court that those letters aren't there.

(Doc. 72-11 at 9).   The court told trial counsel to subpoena the two lawyers, which they promptly did.   (Doc. 72-11 at 14).

The next day the State moved to quash the subpoenas, contending that "none of the requested material is exculpatory of or mitigating toward the defendant...."   (Doc. 70-2 at 90).   The hearing on that motion was held January 29, 1993.   (Doc. 72-13).   The State argued the letters were not "relevant" because they didn't involve Utterbeck and "basically what it is is an attempt by the defense to say, well, the co-defendant's a bad guy so therefore, you know - there's absolutely no relevance."   (Doc. 72-13 at 5).   This prompted the trial court to ask "if they could show that he is a bad guy as opposed to their guy being a good guy that wouldn't go towards mitigation?   Is that your position?"   (Doc. 72-13 at 5). The State maintained its position that the letters were relevant neither to the guilt phase nor the sentencing phase.   (Doc. 72-13 at 5).   However, the State agreed to produce the letters to the trial court, and the court quashed the subpoenas.   (Doc. 72-13 at 9-12, 22).

Also, at the January 29 hearing, it became apparent that the State had not yet produced Vollmer's file.   Consequently, the trial court orally ordered the in-camera production of all materials, including prosecutorial and investigative files relating to Vollmer, and a written order to that effect was entered February 4, 1993.[12]   (Doc. 72-13 at 17; Doc. 70-2 at 104-05).

---

[12] While it is clear the parties relied on the trial court to extract *Brady* material from the State's files, the Respondent properly has never contended that the State discharged its *Brady* obligations by producing its files

At the February 4 arraignment, the District Attorney announced he had produced his files to the trial court, including everything received from the Naval Investigative Service ("NIS").[13]   (Doc. 72-15 at 14-15).   At some point the trial court sealed the files (the "Sealed File"), which consisted of approximately 850 pages.   (Doc. 56-11 at 145-46, Doc. 75-19 at 55-56).

At the February 4 arraignment, the State also announced a modification of its position regarding Hittson's efforts to get the letters Vollmer wrote before Utterbeck's murder.   The District Attorney said that he now agreed that a statement of a codefendant could be admissible at the sentencing phase.   (Doc. 72-15 at 29-30).   Nevertheless, he maintained that Vollmer's letters were still not "relevant" because they did not "apply to Mr. Vollmer's activities or behavior in this case."   (Doc. 72-15 at 31).   In other words, under [*Green v. Georgia,* 442 U.S. 95 (1979)], they are not highly relevant to a critical issue in this case." (Doc. 72-15 at 31).

On February 9, 1993, trial counsel moved for the imposition of sanctions, including dismissal, because of the State's alleged failure to discharge its *Brady* obligations.   (Doc. 70-3 at 26-31).   They contended the State, notwithstanding the trial court's order for the production of prosecution files for in-camera inspection, had still not produced Vollmer's letters.   They attached affidavits from the potential witness' attorneys in which the attorneys stated they gave the letters to the Sheriff and the District Attorney in June 1992.   (Doc. 70-3

_____

to the Court for in-camera inspection.   The prosecutor's good faith, or his good faith reliance on the trial court, does not negate *Brady* error.

[13] Much of the State's case was actually developed by the Navy, which perhaps explains the State's eagerness for trial.   Hittson does not argue that the Navy was effectively an investigative arm of the State and thus, also subject to *Brady.   See Kyles,* 514 U.S. at 438.   However, it is clear that the Navy worked closely with the State in its investigation of Hittson, Vollmer and Utterbeck's death.   In fact, the NIS may have been the primary investigating agency.   As trial counsel put it, the Navy gave the case to the State on a "silver platter." (Doc. 72-7 at 25).

at 32-33).   The motion was addressed at a February 11 hearing, the last hearing before the start of trial.   The District Attorney argued that the court originally ordered him to produce only Hittson's file and the letters were not in that file.   (Doc. 72-18 at 61).   Rather, the letters were in the Sheriff's file.   (Doc. 72-19 at 1).   The District Attorney also again argued the letters were not relevant and that trial counsel was "trying to bring before the jury unrelated bad acts of a co-defendant so that they can get the jury to free this defendant, or at the sentencing phase to go easier on him."   (Doc. 72-19 at 3).   Still, the District Attorney acknowledged that such evidence could be admissible in mitigation if "highly relevant to a critical issue in the case."   (Doc. 72-19 at 3)   The trial court denied the motion, and trial began February 16, 1993.[14]   (Doc. 72-19 at 7).

### b. <u>First State Habeas Counsel's Efforts to Develop *Brady* Claims</u>

First state habeas counsel raised a general, protective *Brady* claim in their petition. (Doc. 75-13 at 16).   As a part of their efforts to develop that claim, they had filed a Freedom of Information Act ("FOIA") request with the Navy.   (Doc. 75-19 at 47-48).   In response, they received some documents and a log of withheld documents.   (Doc. 75-19).   The log listed Vollmer's psychiatric report, which the Navy withheld "based on FOIA exemptions." (Doc. 75-19 at 52).   The Navy informed Hittson's habeas counsel that Vollmer's psychiatric report was two pages, but would not reveal who performed the evaluation or who prepared the report.   (Doc. 75-19 at 58).   First state habeas counsel also filed a Georgia Open Records Act request to gain access to the Houston County District Attorney's file.   (Doc.

---

[14]  It is not clear whether the State or the trial court ever produced to trial counsel the letters written by Vollmer before Utterbeck's murder or whether trial counsel got the two letters from the two lawyers who claim they gave them to the District Attorney.   In any event, by the time the sentencing phase of trial began, the State acknowledged the letters were admissible:   "I guess to the extent that they're offered to show some different degree of culpability, which I'm assuming is the reason the defense is offering them, I believe the case law is clear they would come in.   And the State has no objection."   (Doc. 74-10 at 7).

75-19 at 52, 57).   Habeas counsel reported they were allowed to review the District

Attorney's file (not the Sealed File which would not be opened until this Court allowed

discovery), and Vollmer's psychiatric report was not in the file.   (Doc. 75-19 at 52-53).

At the evidentiary hearing, counsel asked the court to continue the case or keep the

record open because Vollmer's psychiatric report was "the subject of an ongoing FOIA

action in the United States District Court, the District of Columbia."[15]   (Doc. 75-19 at 48).   In

the alternative, counsel requested that "if the State is in possession of ... the psychiatric on

Mr. Vollmer, if they would turn [it] over to you, and you can do an in camera review to see if

there is any *Brady* material in there."   (Doc. 75-19 at 49).   Counsel explained, "It is just very

difficult for me right now to say that we don't have a *Brady* claim, or we do have a *Brady*

claim, when I haven't seen what those documents are."   (Doc. 75-19 at 49).   Counsel

acknowledged that the *Brady* claim was speculative at that point:

> Well, first of all, I can only assume that they[16] are *Brady* material.   I haven't
> seen them, so there is really no way for me to know. Maybe they are not
> exculpatory at all, but I just don't know what they are....
>
> I think that they may provide, you know, evidence that is relevant to mitigation
> in Mr. Hittson's case.

(Doc. 75-19 at 60).

The Respondent did not then, and does not now, dispute that Vollmer's psychiatric

report was not in the State's file produced to first state habeas counsel.   Rather, he

contended the State never had the report and thus, the report was not *Brady* material.

(Doc. 75-19 at 50).   The Respondent suggested that counsel's "basis for having a belief

---

[15] *Hittson v. Dep't of Navy*, 1:97-CV-1513-RMU (D.D.C., July 2, 1997).

[16] Counsel is referring to both Vollmer's psychiatric report and Vollmer's post-arrest letters, which the Navy was also withholding.

that the District Attorney's office was in possession of these things may be faulty…."  (Doc. 75-19 at 62).

The first state habeas court denied Hittson's request to keep the record open:

To establish the *Brady* violation, it would be your burden to come forward at the evidentiary hearing with evidence that there was materially exculpatory information in the possession of the State that was not turned over, and you haven't met that burden.

I don't care to delay the proceedings any further, so I'm just going to deny your *Brady* violation because I don't think you've established it.

(Doc. 75-19 at 67).   Thus, the first state habeas court denied Hittson's general, protective *Brady* claim because there was no evidence, at that point, the State had concealed anything from Hittson.

Following denial of his first state habeas petition, Hittson filed this action and requested discovery.   This Court ordered that the Houston County District Attorney's entire file be produced for Hittson to review.   (Doc. 22 at 12).   The Sealed File was opened pursuant to this order.   (Doc. 59-13).[17]   After inspection of the Sealed File, Hittson informed this Court that a copy of Vollmer's psychiatric report was in the file.[18]   (Doc. 27 at 2).   This action was stayed, and Hittson returned to state court.

### c.  The Second State Habeas Action; Analysis

The second state habeas court found that Hittson's *Brady* claim for the suppression of Vollmer's psychiatric report was procedurally defaulted and Hittson had not established

---

[17]  It is not clear to this Court why the Sealed File was not available to the parties before this Court allowed discovery.   However, the Respondent does not contend that Hittson could have gained access to the Sealed File any earlier than he did.

[18]  This is one mystery in a case of many mysteries.   No one has explained why Vollmer's psychiatric report was not in the State's file during the first state habeas action, but yet the report was in the Sealed File.

cause and prejudice to overcome the default.   In the alternative, the court found this *Brady* claim failed on its merits.   (Doc. 63-1 at 25).

The second state habeas court's order succinctly stated its finding that Hittson had failed to establish cause:

> It is clear from the record before this Court that with "reasonable diligence" trial counsel or his original state habeas counsel could have obtained Vollmer's psychiatric report from a source other than the District Attorney's Office. Petitioner's current counsel obtained Vollmer's report first from a source other than the District Attorney's file.... Therefore, Petitioner has failed to prove cause to overcome the procedural default of his claim.

(Doc. 63-1 at 23).

Thus, the second state habeas court found that Hittson failed to prove cause because his trial counsel and first state habeas counsel, with reasonable diligence, could have obtained the report from another source.   Putting aside for a moment the factual accuracy of this finding, there is a subtle but fundamental flaw in the court's analysis.   The question in cause analysis in the context of a *Brady* claim is whether the prosecutor's concealment of evidence prevented a petitioner from asserting his *Brady* claim earlier.   *Banks,* 540 U.S. at 691.   Here, the answer to that question is undisputed.   The State failed to produce Vollmer's psychiatric report.[19]   Indeed, even the Respondent represented during the first state habeas proceeding that the State never had the report.[20]   (Doc. 75-19 at 55, 61-62). That trial counsel or first state habeas counsel may have been able to get the report from another source does not change the fact that the State literally suppressed the report.   First state habeas counsel could not have asserted a *Brady* claim for the suppression of the

---

[19]  It is, of course, more accurate to say that the trial court failed to produce the report.   Again, however, that does not absolve the State of its obligation to produce *Brady* material.

[20]  This Court does not doubt that this misrepresentation was made in good faith.   There is no evidence that the Respondent knew that Vollmer's psychiatric report was in the Sealed File.

report when they never knew it had been suppressed.   Clearly, the State's suppression of Vollmer's psychiatric report impeded trial, appellate, and first state habeas counsel's "access to the factual basis for making a *Brady* claim."   *Strickler*, 527 U.S. at 283.

In this Court, the Respondent cites cases which he claims hold that the ability of defense counsel to get suppressed evidence from another source precludes a finding of cause.[21]   The Respondent is incorrect.   Each case he cites holds that if defense counsel could have with reasonable diligence discovered facts that would have alerted them to the existence of a claim and yet they failed to assert that claim, then they cannot demonstrate cause to excuse procedural default.   To apply those cases here, this question would have to be asked:   Whether Hittson's lawyers knew or should have known that the State had suppressed Vollmer's psychiatric report.   If so, then Hittson could not prove cause to overcome procedural default because if he knew the State had suppressed the report, he was obligated to raise that claim.

In short, the Respondent's cause argument confuses knowledge of the information suppressed with knowledge that the information was suppressed.   Of course, knowledge of the information suppressed and the ability to get that information from another source are highly relevant to substantive *Brady* analysis and for that reason it is unnecessary to dwell

---

[21]   *Strickler,* 527 U.S. at 283-90 (Prosecutor's suppression of documents favorable to defense "impeded trial counsel's access to the factual basis for making a *Brady* claim" and hindered state habeas counsel from raising the claim.   "[I]t is just such [a] factor[] that ordinarily establish[es] the existence of cause for a procedural default."); *Banks*, 540 U.S. at 691-98 (same); *McCleskey v. Zant*, 499 U.S. 467, 497-500 (1991) (In the context of abuse of the writ and addressing a claim brought, not under *Brady*, but under *Massiah v. United States*, 377 U.S. 201 (1964), the Court explained that the unavailability or suppression of a document during petitioner's first habeas proceeding did not establish cause for failure to raise the *Massiah* claim because petitioner, even without the document, was fully aware of the factual basis for his claim.); *Williams v. Taylor*, 529 U.S. 420, 438-40 (2000) (Addressing diligence in relation to a federal habeas petitioner's request for an evidentiary hearing, the Court faulted Williams, not for failing to obtain an undisclosed report from another source, but for making only a "cursory" effort to "develop the factual basis of []his *Brady* claim in state court."   After being put on notice of the "report's existence and possible materiality," Williams failed to diligently investigate whether the State suppressed the report.).

long on the second state habeas court's cause analysis.   If trial counsel, with the

information they had, could have gotten Vollmer's psychiatric report from another source,

then there was no *Brady* violation and any discussion of cause is rendered moot.   With that,

the Court turns to the second state habeas court's substantive *Brady* suppression analysis.

The second state habeas court denied Hittson's *Brady* claim on its merits for

essentially the same reasons:[22]

> This Court finds Petitioner has failed to meet the requirements of the second
> prong of <u>Brady</u>.   As discussed above, **trial counsel** was aware of Vollmer's
> Navy psychiatric report and diagnosis of anti-social personality disorder.
> Further, Petitioner has failed to prove that his **original state habeas counsel**
> could not have discovered this report from a source other than the State with
> reasonable diligence as Petitioner's current counsel obtained this report by
> means other than the District Attorney's file.   Therefore, this Court finds
> Petitioner has failed to prove that he could not have obtained this report
> through reasonable diligence from a source other than the District Attorney's
> office during trial, direct appeal or during his original state habeas proceeding.

(Doc. 63-1 at 27-28) (emphasis added).

The finding that Hittson's *Brady* claim fails because **first state habeas counsel**

could have obtained Vollmer's psychiatric report from another source reveals another

mistake in the order drafted by the Respondent's counsel.   Whether appellate or state

habeas counsel might have been able to get the report has no relevance to *Brady,* and the

conclusion that Hittson's *Brady* claim fails on the merits because his appellate or habeas

counsel could have gotten Vollmer's psychiatric report is an obvious unreasonable

application of clearly established federal law.   The Respondent acknowledges this error.[23]

---

[22]  The Respondent does not dispute that Vollmer's psychiatric report is evidence favorable to Hittson.
Therefore, Hittson has established the first element of this *Brady* claim.   *Banks,* 540 U.S. at 691.

[23] The Court:     So with regard to substantive *Brady* analysis what difference does it make whether or not
habeas counsel could have gotten it?
   Counsel:     I don't think it does, Your Honor.

This leaves only the finding that trial counsel's knowledge of Vollmer's psychiatric report or its contents prevents Hittson from proving a *Brady* violation.   On this point, the second state habeas court's order is on firm legal footing.   If Hittson's trial counsel could have with reasonable diligence gotten the report or the information contained in the report, then he cannot establish *Brady*'s second prong.

The second state habeas court based its finding that trial counsel should have been able to get Vollmer's psychiatric report on the fact that Hittson's second state habeas counsel were able to get the report.   (Doc. 63-1 at 23).   However, the order does not explain how the mere fact that habeas counsel were eventually (almost ten years later) able to get the report established that the report could have been obtained by trial counsel. Indeed, the second state habeas court did not know how counsel were finally able to get the report.   "This Court has reviewed the entire record and is unable to ascertain where Petitioner initially obtained this report."   (Doc. 63-1 at 21).   Actually, the record does answer this question.

Hittson's current counsel got Vollmer's psychiatric report because Vollmer, who pled guilty after Hittson's trial and is now unrepresented, signed an authorization allowing the Navy to release his psychiatric records to Hittson's lawyers.[24]   (Doc. 59-1 at 3-4).   It is

---

The Court:    Why is it in the order then?
Counsel:      Just kind of trying to cover everything.
The Court:    It covers everything, no doubt about that. ... I mean, what on earth difference does it make if habeas counsel could have gotten it.   I mean, the *Brady* violation occurred, if it occurred, at trial and before trial started actually. ... [W]hat possible answer is it that habeas counsel could have gotten it five or six years after trial?   On a cause analysis maybe, but on a substantive *Brady* analysis I hear you're saying it doesn't make any difference.
Counsel:      I agree, Your Honor.   I mean, again, poorly written, sorry, it doesn't matter.

(Doc. 99 at 20-21).

[24] The Respondent blames Hittson for this mistake in the order drafted by his lawyers.   He argues that if Hittson had filed a post-hearing brief pointing to Vollmer's authorization, the drafters of the order would not

undisputed Hittson's trial counsel did not have access to Vollmer, who was then awaiting trial.   Specifically, Vollmer's counsel would not allow access to Vollmer for the purpose of obtaining "information about the psychological condition of ... Vollmer for use at" the sentencing phase of Hittson's trial.   (Doc. 56-9 at 122; Doc. 56-10 at 67).

Thus, the second state habeas court based its finding that trial counsel reasonably could have obtained Vollmer's psychiatric report on the fact that second state habeas counsel were able to get the report years later.   Yet, for whatever reason, the second state habeas court was unaware the record revealed that habeas counsel were able to get the report only after Vollmer signed an authorization.   The conclusion that trial counsel, operating under extreme time pressure, not knowing the author of the report, and lacking Vollmer's authorization could have in some unspecified way gained access to the report before or during trial is an unreasonable finding in no way supported by this record.

This, however, does not end the inquiry.   The second state habeas court's finding that there was no *Brady* suppression of Vollmer's psychiatric report because trial counsel could have gotten the report themselves is still entitled to full AEDPA deference.   Thus, although it was unreasonable for the second state habeas court to conclude that trial counsel could have gotten the report simply because second state habeas counsel got it, there remains the question of whether there is other evidence that trial counsel, with reasonable diligence, could have gotten the report.

To answer this question, it is necessary to determine what trial counsel knew and when they knew it.   Shortly before the start of trial, the trial court, after its in-camera inspection of the State's files, provided trial counsel with a NIS document summarizing the

have made this mistake.   (Doc. 83 at 21).

Navy's investigation of Utterbeck's death, including a summary of Hittson's confession to NIS investigators ("NIS document").   One sentence of the NIS document stated that Vollmer "had been seen by CDR K. Bohnker, MC, USN, Medical Department, USS Forrestal, on 08Feb91 and was diagnosed as having an antisocial personality disorder. Exhibit (4) pertains."[25]   (Doc. 70-6 at 46).[26]   The exact date trial counsel received the NIS document from the trial court is not clear, but there is no indication they got it before the February 4, 1993 hearing, when the District Attorney informed the trial court that he had then produced all his files.   Nor is it clear why the trial court produced the NIS document but did not produce Vollmer's psychiatric report, which was attached as Exhibit 4 in the Sealed File. Most likely the trial court, or the court's law clerk,[27] produced the NIS document because it generally summarized the Navy's investigation, including Hittson's confession.   (Doc. 70-6 at 47).   Certainly, the NIS document should have been produced for reasons apart from its brief reference to Vollmer's psychiatric disorder, but it is difficult to understand why the trial court did not produce Vollmer's psychiatric report given the detailed discussions with trial counsel about their mitigation strategy and its focus on Vollmer.   (Doc. 71-12 at 4, 8; Doc. 71-15 at 7; Doc. 72-11 at 8-10, 13; Doc. 72-13 at 5).

---

[25]  The Respondent does not argue that the reference to Vollmer's antisocial personality disorder in the NIS report should have put trial counsel on notice that the State was suppressing Vollmer's psychiatric report, thus precluding a finding of cause.   The State had produced all its files to the trial court, and trial counsel had no reason to think that the court had not produced to them all exculpatory material.

[26] This record cite is potentially confusing.   When Hittson's lawyer examined one of Hittson's trial counsel at the second state habeas evidentiary hearing, he used as an exhibit the copy of the NIS document that was in the Sealed File.   (Doc. 56-9 at 117).   However, the transcript makes clear that a copy of the NIS document was in trial counsel's file and that trial counsel had received the NIS document from the trial court.   (Doc. 56-9 at 117, 120).   This Court has located a partial copy of the NIS document in trial counsel's files at pages 63-64 and 66-67 of Doc. 62-5.   In addition to the NIS document, trial counsel apparently received copies of Naval interviews with several sailors and a copy of Hittson's waiver of rights and the results of his Naval interrogation. (Doc. 59-17 at 80-109, 138-40; Doc. 62-5 at 30-44, 70-72; Doc. 62-7 at 16-30, 9-11).   However, it is undisputed that neither the State nor the trial court ever disclosed Vollmer's psychiatric report.

[27]  It appears the law clerk conducted most if not all the review.

Had Vollmer's psychiatric report been produced, trial counsel would have learned that Dr. Donald Gibson, a forensic psychiatrist, actually made Vollmer's psychiatric diagnosis of antisocial personality disorder.   At the second state habeas court evidentiary hearing, Dr. Gibson testified that Dr. Bohnker was a USS *Forrestal* flight surgeon, not a psychiatrist, who referred Vollmer to Dr. Gibson because of Bohnker's provisional diagnosis of "Personality Disorder, Antisocial."   (Doc. 56-11 at 79-83; Doc. 56-15 at 4-5).   Dr. Gibson testified at the evidentiary hearing in the second state habeas action that R. J. Dusan, a mental health social worker, interviewed Vollmer and then discussed the interview with Dr. Gibson.   Dr. Gibson made the diagnosis of antisocial personality disorder, which he characterized in his report as a "severe personality disorder that will not improve with counseling ...."   (Doc. 56-15 at 5).   Dusan wrote the final report, and both signed the report. (Doc. 56-11 at 85-88).   It is undisputed that trial counsel were not aware of either Dr. Gibson or Dusan.

Thus, to the extent the NIS document suggested Dr. Bohnker made Vollmer's psychiatric diagnosis, it was misleading – not intentionally so – but misleading nonetheless. Nevertheless, trial counsel acknowledged they were "aware of the existence of a possible report."   (Doc. 56-9 at 120).   Based upon the NIS document, trial counsel, with only days before the start of trial, attempted to locate Dr. Bohnker.   Trial counsel's handwritten notes of a telephone conversation with Navy personnel state:   "Sr. Med Off--Bruce Bonkers, M.D. currently attached to Comdr Naval Forces Atlantic--Norfork, VA.   Staff Med. Off. reviewed Vollmer and found him to have psych. prob serious enough to be discharged shortly before they killed Utterbeck--getting into trouble."   (Doc. 59-13 at 37).   Thus, they attempted to find the author of the possible report "so we could put a subpoena in their hands, or at least

discuss as much as possible the psychological or psychiatric condition of Mr. Vollmer."
(Doc. 56-9 at 120).

Under these circumstances, it is apparent that trial counsel "did not have equal
access to [Vollmer's psychiatric report] nor could [they] have obtained it through the exercise
of due diligence." *United States v. Severdija,* 790 F.2d 1556, 1559 (11th Cir. 1986).   First,
Vollmer's psychiatric report was not a public record that was readily available to trial
counsel. *Parker v. Allen,* 565 F.3d 1258, 1277 (11th Cir. 2009).   Second, even if trial
counsel had been able to locate Dr. Bohnker, who was neither the author of the report nor
the doctor who made the diagnosis, there is nothing to support any conclusion that he would
have talked to trial counsel or that he would or could have directed trial counsel to Dr.
Gibson.   Certainly, there is no reason to think that Dr. Bohnker, even if he had Vollmer's
psychiatric report, would have produced it to trial counsel.   In short, based on the scant
information given to trial counsel shortly before the start of trial, there is no reasonable basis
to conclude that trial counsel, with reasonable diligence, could have obtained the report or
located Dr. Gibson.   The State, on the other hand, had full access to the Navy's files.   The
District Attorney explained that he requested "anything that the Naval Intelligence Service
ha[d] ... and of course, they gave it to [him]."   (Doc. 72-15 at 14).

Thus, the limited information given to trial counsel shortly before the start of trial
cannot support a finding of no suppression, and the second state habeas court's decision to
the contrary was based on an unreasonable determination of the facts and involved an
unreasonable application of *Brady*.

This leaves only the issues of prejudice and materiality, which the Court discusses
after reviewing the suppression of Vollmer's post-arrest letters.

### 2. **The Suppression of Vollmer's Post-Arrest Letters**

On January 12, 1993, and again on January 15, Vollmer wrote letters to Joleen Ward, a shipmate.   (Doc. 56-15 at 6-17).   The NIS somehow got the letters and forwarded them to the State during Hittson's trial.   (Doc. 56-15 at 6).   The State did not produce the letters to trial counsel.   The discussion above regarding first state habeas counsel's efforts to get Vollmer's psychiatric report largely applies to their efforts to get Vollmer's post-arrest letters, although trial counsel had no hint the letters existed.   There is some mystery surrounding Vollmer's post-arrest letters.   There is also another significant error in the second state habeas court's analysis of Hittson's *Brady* claim arising from the alleged suppression of the post-arrest letters.   Respondent admits and takes responsibility for this error.

The mystery is this:   As discussed, there was considerable debate and controversy before Hittson's trial about the letters Vollmer wrote before Utterbeck's murder.   Trial counsel eventually got these letters and used them in the sentencing phase, but trial counsel knew nothing about the post-arrest letters.   By the time of the first state habeas evidentiary hearing, Hittson's lawyers still did not have Vollmer's post-arrest letters.   (Doc. 75-19 at 48-52).   They knew they existed because they were identified in the log of withheld documents produced by the Navy in its FOIA response.   (Doc. 75-19 at 44-47, 52).   First state habeas counsel claimed they had reviewed the State's file, produced in response to the Open Records Act request, and the post-arrest letters were not in the file.   (Doc. 75-19 at 52-53).   They suspected, however, that Navy investigators had sent the letters to the District Attorney.   As they did with Vollmer's psychiatric report, first state habeas counsel asked the court for additional time to obtain the letters and requested the Respondent give the post-arrest letters to the court to conduct an in-camera review to determine if the letters were *Brady* material.   (Doc. 75-19 at 49).   The Respondent's position was that the State

never had possession of the letters, and therefore no *Brady* violation had occurred.[28]   (Doc. 75-19 at 50-52, 55).

As it turned out, the post-arrest letters were not in the Sealed File, not because the State did not have them but rather because they were not sent to the State until after the State had produced its files for in-camera inspection.   (Doc. 56-9 at 62; Doc. 99 at 34, 38). Apparently, and notwithstanding the trial court's order imposing a continuing obligation on the State to submit after-acquired evidence to the court, the letters were not submitted to the trial court.   (Doc. 70-2 at 104-05).

By the second state habeas evidentiary hearing, the letters were in the District Attorney's file.   No one can explain why the letters were not in the District Attorney's file at the time of the first state habeas evidentiary hearing, why the Respondent represented at the first state habeas evidentiary hearing that the State never had the letters, and how it is that the letters came to be in the State's files many years later.   (Doc. 99 at 40-45, 48).

Fortunately, it is not necessary for this Court to answer these questions because the second state habeas court found that the State suppressed Vollmer's post-arrest letters, a finding that is supported by the record.   (Doc. 63-1 at 29).   However, this leads to the error in the second state habeas court's order.

The Respondent contended in the second state habeas action that the *Brady* claim for the suppression of the post-arrest letters, like the *Brady* claim for the suppression of Vollmer's psychiatric report, was procedurally defaulted.   (Doc. 56-9 at 60-61; Doc. 99 at 40).   Yet the second state habeas court's order, as drafted by the Respondent's counsel,

_____

[28] Just as this Court does not doubt that the Respondent's misrepresentation that the State did not have Vollmer's psychiatric report was made in good faith, this misrepresentation too was made in good faith.

concluded that the State had suppressed the letters and found that "this portion of Petitioner's <u>Brady</u> claim is properly before this Court."   (Doc. 63-1 at 30).   Given the finding of suppression, and hence cause, the court's conclusion that Hittson's *Brady* claim was properly before the court suggests that the court also found prejudice.   Yet the court then proceeds to find, in its substantive *Brady* analysis, that the suppressed evidence was not material.   (Doc. 63-1 at 33-34).   Because procedural default prejudice analysis is the same as the *Brady* materiality analysis, it seems impossible that the court could find prejudice but not materiality.   *Banks*, 540 U.S. at 691.

The reason for this mistake in the Order is not a mystery.   As explained at oral argument in this Court, the Respondent's counsel made a mistake when they drafted the order:

> I don't think the order skips over the procedural default. I think he looks at cause to begin with and he says, well, they have been suppressed therefore I'm going to look at this claim and he skips over prejudice, which was incorrect. I mean, he should have done the prejudice -- essentially a prejudice analysis for [a] procedurally defaulted claim is the same as your materiality argument. I mean, the Eleventh Circuit has lots of case law saying those are the same analysis.
>
> So he could have done that analysis under the prejudice which that's how it should have been written, it just was not.   I apologize.

(Doc. 99 at 44-45).   At another point, counsel for the Respondent explained that because of "some rather inaccurate writing there, it's clearly not found to be procedurally defaulted…. But it should have been a cause and prejudice analysis.   It should have been procedurally defaulted."   (Doc. 99 at 40).

Thus, this Court finds itself in this position.   The *Brady* claim for the suppression of Vollmer's post-arrest letters was procedurally defaulted and absent a showing of cause and prejudice, that claim should have been barred.   Yet the second state habeas court's order,

after finding cause, ruled that the claim was properly before the court and, therefore, not procedurally defaulted.   The Respondent contends that this finding excusing procedural default was not based on a finding of prejudice but rather was based on poor drafting by his lawyers.   Nevertheless, this finding leaves the Respondent only with the argument that the suppressed evidence was not material, *Brady*'s third prong.   Yet, the Respondent acknowledges that the materiality and prejudice analyses are identical.   Therefore, if there had truly been a finding that the claim had not been procedurally defaulted, that finding would have necessarily meant that Hittson had proven the suppressed evidence was prejudicial.   If so, he would also have established *Brady* materiality, and thus Hittson would have prevailed on this *Brady* claim.

Of course, the Respondent's counsel never intended to draft the second state habeas order to find in Hittson's favor on this claim, and thus the Court accepts the Respondent's explanation.   As incongruous as it is, this means that there is no procedural default but the issue of *Brady* materiality remains.

### 3. **The Prejudicial Impact ,Individual Materiality, and Cumulative Materiality of the Suppressed Evidence**

With regard to Vollmer's psychiatric report, the second state habeas court found that Hittson failed to prove prejudice to excuse procedural default and failed to prove *Brady* materiality.   (Doc. 63-1 at 23-25, 28-29).   The second state habeas court found that Vollmer's post-arrest letters had been suppressed but found that the letters were not material, and thus concluded Hittson had failed to prove a *Brady* violation.   (Doc. 63-1 at 29-34).   The second state habeas court then conducted a cumulative *Brady* materiality analysis of all allegedly suppressed evidence and found Hittson had failed to prove cumulative materiality.   (Doc. 63-1 at 48-50).

Before examining the second state habeas court's prejudice and materiality rulings, it is appropriate to summarize Hittson's argument regarding the importance of the suppressed evidence to his mitigation theory.   Hittson's lawyers sought to prove that Vollmer was a brilliant but evil manipulator who could easily control someone as dim-witted as Hittson.   To help make the point, Hittson cites the statement made by the District Attorney when he opposed parole for Vollmer.

> Although he received the "lesser" sentence, it is evident from the information received in the investigation that Vollmer was the instigator in the murder, that he convinced Hittson to do it, that the manner of disposing of the body was Vollmer's idea, and that Vollmer is, in a word, EVIL!

(Doc. 56-13 at 114-15).   Hittson argues that if his trial counsel had this "information received in the investigation," then they could have better shown that Vollmer was the "instigator," that he convinced Hittson to participate, that Vollmer was responsible for the dismemberment, and that he had an "evil" and "perverted mind."   (Doc. 56-13 at 115).   In short, defense counsel's mitigation theory was that Vollmer was a smart, manipulative, and controlling individual who had a strong, overwhelming influence over Hittson, who was submissive, passive, slow, and dependent.

Vollmer's psychiatric report supports this mitigation theme.   Vollmer's intelligence was average or above and he "has no remorse for his actions as they affect others."   (Doc. 56-15 at 4).   The report includes a diagnosis of antisocial personality disorder and a recommendation that Vollmer be discharged from the Navy because he had "a severe personality disorder that will not improve with counseling and ... he will continue acting out." (Doc. 56-15 at 4-5).

Dr. Gibson testified at the evidentiary hearing convened by the second state habeas court.   He explained why he classified Vollmer's antisocial personality disorder as severe:

But the severe is placed there so they'll understand that we're not just talking about somebody with average problems; we're talking about somebody who has severe problems.   He has adaptability problems.   He has interpersonal problems.   He has problems with authority.   He has problems doing what he's supposed to do.   He's done illegal things, things for which if he had gotten caught doing them he would have been arrested.   He violates the rights of everybody.   And that's basically it, and that's why we say it that way, so people will know that we're not just kidding, this is something that's serious and needs to be taken care of right away.

(Doc. 56-11 at 109-110).

Hittson also submitted to the second state habeas court the affidavit of Dr. Jerry Lee Brittain, a neuropsychologist with considerable military medicine experience.   (Doc. 56-16 at 40).   Dr. Brittain reviewed Vollmer's psychiatric report and opined on the significance of Vollmer's diagnosis of antisocial personality disorder.   Dr. Brittain noted that the report reveals that Vollmer scored in the 99th percentile on the Armed Forces Qualification Test, a score that he had only seen once before in his Navy career.   (Doc. 56-16 at 47).   Hittson, on the other hand, scored in the 48th percentile.   Vollmer's "extremely high level of intelligence with an Antisocial Personality Disorder suggests a very manipulative, clever, sophisticated con artist – that is typically a person who often gets away with their infractions because they are smart enough to avoid getting caught, many times at the expense of a weaker codefendant."   (Doc. 56-16 at 48).   This, Dr. Brittain continued, "must be viewed in conjunction with the passive-dependency and the other psychological vulnerabilities, including lower intellect, exhibited by Mr. Hittson."   (Doc. 56-16 at 48).

Vollmer's post-arrest letters fit neatly with Vollmer's psychiatric report and Dr. Gibson's and Dr. Brittain's testimony.   Although, as the second state habeas court found, much in these letters is cumulative of the letters Vollmer wrote before Utterbeck's murder,

which the jury had, two portions of the post-arrest letters speak directly to the prosecution for

Utterbeck's murder:

> It's not like I'm going to be stuck in here forever.   Sure, I may do two or three
> more years at the most, but I wouldn't be surprised if I'm cut loose after the trial
> in August.   These fuckers haven't got a clue or a brain in their heads, and
> they'll be lucky if they keep their jobs after the public finds out how bad they've
> bungled the investigation and how far out of bounds they've stepped.   When
> this case goes to trial, it'll be a damn three ring circus.   They're in my
> hometown, for [C]hrist sakes, with my hand picked judge and my hand picked
> jury.   Everyone who's lived here since '73 are my character witnesses, and
> there isn't a man or woman who doesn't know me, at least in passing.   I used
> to think I didn't have a chance, because of the dirty, underhanded way the
> investigation was going, but now I know who doesn't have a chance.

(Doc. 56-15 at 8).

> [S]it down and think long and hard about it.   Why?   These fuckers couldn't
> come up with a better motive than "drugs" or "cult religion"?   They're the
> fuckin Keystone Cops.   I could sit on the shitter reading the paper and come
> up with more and better motives ....
> There are a lot of questions left unanswered, and I'm the only key to the
> mystery.   They can assume and guess, but only two people actually know
> what happened and I've never talked to any cops or made a confession, so it
> looks like the whole world's gonna have to wait till August to hear me speak,
> and only if I feel like it.

(Doc. 56-15 at 17).

The second state habeas court found that Hittson failed to prove prejudice to excuse

the procedural default of his *Brady* claim for the suppression of Vollmer's psychiatric report

for two reasons.[29]   First, the court found that Vollmer's psychiatric report was cumulative of

the testimony of Hittson's lay witnesses who testified that Vollmer was an intelligent and

violent manipulator while Hittson was a "kind of stupid" follower.   (Doc. 63-1 at 23-24).   The

court rejected the notion that jurors would have given more weight to expert medical

evidence than lay witness testimony because there was "no evidence that the jury

---

[29] As it did in its cause and *Brady* suppression analysis, the second state habeas court's order discusses
prejudice and *Brady* materiality separately and in part bases its conclusions on different findings.

discounted the testimony of the defense witnesses."   (Doc. 63-1 at 24).   "Mere speculation

on what weight the jury might have given to Vollmer's psychiatric report does [not][30] fulfill the

prejudice prong of *Brady* (sic) ...."[31]   (Doc. 63-1 at 24).

Second, the court rejected the argument that Vollmer's psychiatric report would have

been useful to Hittson's mental health expert, Dr. Brittain, because Dr. Brittain testified in his

affidavit that he would need to evaluate Vollmer to render his opinions, and Hittson failed to

prove that Vollmer would have submitted to such an evaluation.   (Doc. 63-1 at 25).

Moreover, the court concluded, Hittson had failed to prove that trial counsel's strategy

regarding their mental health experts would have changed, because they did not testify they

would have called their mental health experts if they had the report.   (Doc. 63-1 at 25).

With regard to *Brady* materiality, the second state habeas court concluded that given

the "enormous body of evidence against Hittson, there is simply no doubt that Petitioner is

guilty of malice murder and that the inclusion of the co-defendant Vollmer's psychiatric

report would have had no effect on this verdict."   (Doc. 63-1 at 29).   Further, as it did in its

prejudice analysis, the court concluded that Vollmer's psychiatric report was cumulative of

the lay witness testimony about Vollmer and Hittson and the two letters written by Vollmer

before Utterbeck's murder.   (Doc. 63-1 at 29).   With regard to the materiality of Vollmer's

post-arrest letters, the second state habeas court tersely concluded Hittson had failed to

prove the letters were material because they "were merely cumulative of other evidence and

testimony offered at trial, and there was overwhelming evidence of Petitioner's guilt."   (Doc.

63-1 at 34).

---

[30] The "not" is missing.   Clearly, however, the Respondent's counsel intended the "not" to be there.

[31] The Respondent's counsel meant to write "the prejudice prong of procedural default analysis" when they
drafted the order.

In its cumulative *Brady* review, the second state habeas court evaluated not only Vollmer's psychiatric report and post-arrest letters, but other evidence that Hittson claimed had been suppressed.   However, its cumulative review was consistent, in part, with its separate review of these two items.

> Trial counsel presented the testimony of many witnesses who personally knew Vollmer and Petitioner, had interacted on a daily basis in closed quarters aboard a Navy ship, and testified about Vollmer's manipulative arrogant and evil personality and how Petitioner was taken in by Vollmer.   This Court fails to see how further evidence in the form of a Navy psychiatric report … that simply restate[s] this evidence and post-arrest letters written by Vollmer, that are entirely similar to the letters read at trial, would have created a reasonable probability of a different result.

(Doc. 63-1 at 48-49).   Thus, in its cumulative review, the court found the suppressed evidence to be cumulative of the evidence Hittson offered at trial.

However, the court also noted Hittson's confession "to swinging the bat that assaulted the victim and to being the triggerman [and] ... to participating in the mutilation and burial of the body."   (Doc. 63-1 at 49).   Presumably, this is a reference to the overwhelming evidence of the horror of the murder.   If so, then the court also found in its cumulative review that the evidence was so overwhelming that there is no reasonable probability that the timely production of Vollmer's psychiatric report and the post-arrest letters would have changed the outcome of the sentencing phase of the trial.

Although confusing in some respects, the second state habeas court identified and applied the correct legal standard in its prejudice and materiality analyses, including its cumulative analysis:   Whether there was a reasonable probability that the outcome of the proceedings would have been different if the suppressed evidence had been disclosed. (Doc. 63-1 at 25, 49).   The court ultimately determined that it would not have been.   In reaching this decision, the second state habeas court made several findings of fact.   This

Court must determine whether these factual findings were unreasonable in light of the evidence presented at the second state habeas evidentiary hearing.   In making this determination, the Court presumes the second state habeas court's factual findings to be correct and recognizes that Hittson can rebut this presumption only by clear and convincing evidence.[32]   The Court also must determine whether the second state habeas court unreasonably applied the materiality prong of *Brady* to these facts.

Some of the reasons given by the second state habeas court for its prejudice and materiality conclusions can be addressed fairly quickly.   First, the finding that led the court, in its prejudice analysis, to dismiss Dr. Brittain's testimony is clear factual error.   The court's order stated that "Petitioner's own expert Dr. Brittain stated in his affidavit that in order to properly evaluate the relationship between Petitioner and Vollmer, he would also have to evaluate Vollmer."   (Doc. 63-1 at 25).   The court found "Petitioner has failed to prove that Vollmer would have submitted to such an evaluation…."   (Doc. 63-1 at 25).   The problem with this is that Dr. Brittain's affidavit said no such thing; he never said or even suggested that he needed to evaluate Vollmer.[33]   Thus, based on an erroneous factual finding, the second state habeas court did not consider a significant part of the evidence relied on by Hittson to prove prejudice to overcome procedural default.

Also in its prejudice analysis, the second state habeas court found that "trial counsel refused to testify that, in light of Vollmer's psychiatric report, they would have presented

---

[32]   Regardless of whether the second state habeas court's factual findings were made when determining prejudice to overcome procedural default or materiality to establish a *Brady* claim, its factual findings are presumed correct and Hittson has the burden of rebutting that presumption by clear and convincing evidence. *See Greene v. Upton*, 644 F.3d 1145, 1154 (11th Cir. 2011).

[33]   The Court asked the Respondent to explain why his counsel put this finding in the order.   Counsel responded that Dr. Brittain's statement that he needed to know Vollmer's mental health history meant that he would have to evaluate Vollmer.   (Doc. 97).   It is stretches like this that could undermine any confidence that the second state habeas court order is a product of independent judicial review.

Petitioner's mental health expert," referring, presumably, not to Dr. Brittan but rather to the experts retained by trial counsel, Dr. Michael J. Prewett, Dr. Norman Moore, and Ms. Mary Shults.[34]   (Doc. 63-1 at 25).   Thus, the court found Hittson failed to prove that trial counsel, armed with Vollmer's psychiatric report, would have "changed their trial strategy regarding presentation of [his] mental health experts."   (Doc. 63-1 at 25).   This finding has somewhat firmer footing.   Trial counsel did not directly testify that they would have put Dr. Prewett or any other mental health expert on the stand if they had Vollmer's psychiatric report.   (Doc. 56-9 at 184-85; Doc. 56-10 at 80).

However, the second state habeas court made no mention of what trial counsel said about the expert mental health testimony they could have presented if they had Vollmer's psychiatric report.   Hollomon testified that they "could have put up the information, specifically the report about Mr. Vollmer, perhaps even using the individual that drafted it … if we'd known about it."   (Doc. 56-9 at 185; Doc. 56-10 at 80).   If they had the report, he continued, they could have spoken with Dr. Gibson and "potentially brought this individual to court to ask him about this or … more generically, utilized information to acquaint the jury with Mr. Vollmer's psychological condition" because "it would have buttressed the defense that we had initially pursued in a pretty significant manner."   (Doc. 56-10 at 115-16).   Trial counsel made clear that the importance of the report was not limited to whether their experts would have testified.   As Walter Sammons put it, they:

> would have … gotten into Vollmer's mental health problems, without talking
> about [Hittson] …. I don't think that putting any evidence on Vollmer would
> have opened the door on Hittson, so … if we had the report … we'd have
> wanted to use it to strengthen or bolster our argument that … Vollmer was a
> severe, had a severe antisocial personality disorder and was amoral about the

---

[34] Although Mary Shults's name is spelled in various ways throughout the record, "Shults" is correct.   (Doc. 75-20 at 4-11).

effect that things that he did had on other people and that it wasn't just lay witnesses saying that, it was a Navy psychiatrist or psychologist.

(Doc. 56-10 at 80).

Thus, to the extent that the second state habeas court's finding that Vollmer's psychiatric report would not have led trial counsel to change "their trial strategy regarding presentation of Petitioner's mental health expert" is a conclusion that trial counsel would not have called Dr. Prewett, Dr. Moore, or Ms. Shults, it is reasonable and is fairly supported by the record.   If, however, that finding meant to suggest that trial counsel's strategy regarding mental health evidence would not have changed, it clearly is unreasonable and is not supported at all by the record.

Also, in its prejudice analysis, the second state habeas court rejected Hittson's arguments regarding the significance of expert testimony about Vollmer's severe personality disorder because "there is no evidence that the jury discounted the testimony of the defense witnesses."   (Doc. 63-1 at 24).   Thus, the court concluded, Hittson's "mere speculation on what weight the jury might have given to Vollmer's psychiatric report does [not] fulfill the prejudice prong of *Brady*."[35]   (Doc. 63-1 at 24).   While it is true that Hittson offered no evidence that jurors discounted lay testimony because it was not supported by expert testimony, it is just as true that it would not have been possible for Hittson to have adduced such evidence.   For example, testimony by jurors offered to impeach their verdict is not admissible.   O.C.G.A. § 17-9-41 (juror affidavits "may be taken to sustain but not impeach their verdict").

---

[35] As noted (fn 30 *infra*), the Court assumes the Respondent's counsel meant the order to say that Hittson could not fulfill the prejudice prong of the procedural default analysis.

Moreover, the court's out-of-hand rejection of Hittson's contentions regarding Vollmer's psychiatric report and the labeling of expert testimony its disclosure may have prompted as "mere speculation" reflects a fundamental misunderstanding of prejudice analysis.   Never has the Supreme Court required a petitioner seeking to prove prejudice to show that jurors at his trial did or did not do something during their deliberations.   On the contrary, the Supreme Court has specifically recognized that determining prejudice "will necessarily require a court to 'speculate' as to the effect of the new evidence."   *Sears v. Upton*, 130 S. Ct. 3259, 3266-67 (2010).[36]

The second state habeas court found in both its prejudice and materiality analyses that Vollmer's psychiatric report and post-arrest letters were cumulative of the lay witness testimony and the two letters Vollmer wrote before Utterbeck's murder.   In a broad nonspecific sense this may be true.   The lay witnesses testified that Vollmer was intelligent, violent, a leader who told Hittson what to do, "played with people's heads," and spoke of killing people and cutting up their bodies since he had been in high school.   (Doc. 74-9 at 7, 9, 11, 21, 46, 55, 57; Doc. 74-10 at 28).   In the two letters, Vollmer wrote about getting "that redheaded sack of shit and mak[ing] him suffer hardships and woe of biblical proportions. Then [he would] outright kill him" and "spit on his lifeless body."[37]   (Doc. 74-15 at 14-15). He would kill anyone for $500 and "[m]orals are for losers trying to justify their place in life." (Doc. 74-15 at 17).

In a more reasonable sense, however, the psychiatric evidence Hittson now has and Vollmer's writings about the prosecution's supposed bumbling and fumbling and his control over the entire process are not at all cumulative of the evidence the jury heard.   Had Dr.

---

[36] *Sears* involved prejudice in the *Strickland* context, but the relevant point is the same.

[37] In these letters, Vollmer was referring to the boyfriend of his former girlfriend.   (Doc. 74-15 at 14-15).

Gibson testified during the sentencing phase of Hittson's trial, the jurors would have heard the former Navy chief of psychiatry, who was not an expert hired by one side or the other, testify that Vollmer suffered from a severe psychiatric disorder, so severe that the doctor went to some length to let the Navy know that something needed to be done about Vollmer right away.   (Doc. 56-11 at 79, 92).   The jury would have heard the testimony of a military neuropsychologist, albeit one retained by the defense, about the control Vollmer could have exercised over Hittson.   (Doc. 56-16 at 40-49).   The post-arrest letters would have painted a far starker, much more relevant picture of Vollmer than his abstract rants in letters he wrote before Utterbeck's death.   They reveal that Vollmer, having now engaged in murder rather than just talking about it, still viewed himself as the puppet master.   The prosecution was inept and unethical.   He was on his home turf and had handpicked the judge and would handpick the jury.   In any realistic, reasonable sense, this evidence was not cumulative of the evidence the jury heard during the sentencing phase of trial.   However, if given appropriate AEDPA deference, whether the court's finding that the suppressed evidence was cumulative is a close call.   Rather than making that call, the Court turns to the second state habeas court's remaining finding supporting its conclusion that the suppressed evidence would not have changed the outcome of Hittson's trial.

In its materiality analyses, including its cumulative *Brady* review, the second state habeas court cited the overwhelming evidence against Hittson, finding that "there is simply no doubt that [Hittson] is guilty of malice murder and that the inclusion of co-defendant Vollmer's psychiatric report would have had no effect on this verdict," and, with regard to Vollmer's post-arrest letters, "there was overwhelming evidence of Petitioner's guilt."   (Doc. 63-1 at 29, 34, 49).   Not surprisingly, Hittson argues that the second state habeas court considered the "overwhelming evidence" in the context of his guilt, which Hittson did not

contest, rather than in the context of punishment.   (Doc. 84 at 12).   The Respondent argues that "it is clear from the order that the state habeas court evaluated the materiality of the report with regard to both the guilt/innocence phase and the sentencing phase."   (Doc. 83 at 22).   While the Court acknowledges the Respondent's unique insight into the order drafted by his lawyers, this argument is not convincing.   There was simply no reason for the second state habeas court to evaluate the materiality of Vollmer's psychiatric report or his post-arrest letters with regard to the guilt/innocence phase of Hittson's trial.

Nevertheless, reading the order as a whole and with appropriate AEDPA deference, the Court accepts that the second state habeas court viewed the "enormous body of evidence against Hittson" as it related to the sentence imposed.   (Doc. 63-1 at 29).   The evidence cited by the court, although introduced during the guilt/innocence phase, was used by the prosecution during the penalty phase.   In his opening statement before the sentencing phase of Hittson's trial, the prosecutor informed the jury that he did not expect to present additional evidence, but rather he would rely on "all evidence, all testimony, and all exhibits which have been given to you in the guilt-innocent part."   (Doc. 74-8 at 15).   In his closing argument at the sentencing phase, the prosecutor, as did the second state habeas court, emphasized the manner in which Hittson bludgeoned Utterbeck as he slept, shot him in the head as he begged for his life, and "dismembered and bagged and strewed out" Utterbeck's body over two states.   (Doc. 74-10 at 94).   While it would have been helpful if the second state habeas court's order had been a little clearer, this Court is satisfied that the second state habeas court found that the evidence necessary for the jury to recommend the death penalty was overwhelming, so overwhelming that there is not a reasonable probability the suppressed evidence, viewed independently and cumulatively, would have changed the outcome at the sentencing phase of Hittson's trial.

The second state habeas court's finding was reasonable; the evidence of the horror of Utterbeck's murder was overwhelming.   But the suppressed evidence was far from insignificant.   A court applying a de novo standard of review could conclude that Vollmer's psychiatric report and his post-arrest letters were material.   Certainly a court conducting a de novo review could reasonably find, in a cumulative analysis, that had jurors heard the suppressed evidence, there is a reasonable probability that they would not have sentenced Hittson to die.

However, if anything is clear in AEDPA jurisprudence, it is that "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."   *Wood v. Allen*, 130 S. Ct. 841, 849 (2010).   As the Eleventh Circuit recently said, "[t]o be unreasonable, the error in the state court's finding must be so clear that there is no possibility for 'fairminded disagreement.'" *Holsey v. Warden, Georgia Diagnostic Prison,* 694 F.3d 1230, ___ (11th Cir. 2012) (quoting *Harrington*, 131 S. Ct. at 786-87).   Similarly, the "state court's application of clearly established federal law ... is unreasonable only if no 'fairminded jurist' could agree with the state court's determination or conclusion."   *Id.* at *25 (quoting *Harrington*, 131 S. Ct. at 786). Bound by AEDPA deference, this Court cannot say that the second state habeas court's decision that, due to the overwhelming evidence of the brutality of Hittson's crime, there is no reasonable probability the suppressed evidence, considered individually or cumulatively, would have changed the outcome at the sentencing phase of Hittson's trial, is based on an unreasonable determination of the facts or involved an unreasonable application of *Brady*.

In sum, of the various reasons given by the second state habeas court, the Court concludes that its findings that the evidence heard by the jury was so overwhelming that the

outcome would not have been different had the jury had the benefit of the suppressed evidence was not an unreasonable conclusion.[38]   Thus, the second state habeas court reasonably found that Hittson failed to establish a *Brady* claim for the suppression of Vollmer's psychiatric report because he had not shown the report to be material.   Further, the second state habeas court did not unreasonably find that Hittson failed to establish the *Brady* materiality of Vollmer's post-arrest letters.   Finally, the second state habeas court did not unreasonably find that Hittson failed to establish the cumulative materiality of the suppressed evidence.

### 4.   The Three Witnesses *Brady* Claim

In his motion for leave to conduct discovery filed in this Court on October 15, 2002, Hittson argued that Connie Michelle Vollmer, Christopher Landin, and Diana McCarty all gave the State exculpatory information about Vollmer, which the State failed to disclose. (Doc. 15 at 26-27).   To support this claim, Hittson relied on affidavits from each of these individuals, which his attorneys obtained in 2002.   (Doc. 15 at 26-27).   Hittson argued that additional evidence of this suppression might be in the Sealed File.   (Doc. 15 at 26-27). Now that the Sealed File has been opened, Hittson does not allege that he made any discovery related to Connie Michelle Vollmer, Christopher Landin, or Diana McCarty.[39]

---

[38]  The Court understands that it has not ruled on the second state habeas court's conclusion that Hittson failed to prove prejudice to excuse procedural default of his *Brady* claim for Vollmer's psychiatric report.   For some reason, the second state habeas court's prejudice analysis did not rely on the overwhelming evidence of the brutality of the crime.   If it had, this Court would have affirmed for the same reason it was unable to disturb the court's materiality rulings based on this overwhelming evidence.   Under AEDPA, this Court can rely on this overwhelming evidence to find no prejudice even though the state court did not.   In any event, because of the complete overlap between the prejudice and materiality standards, this Court's ruling on *Brady* materiality, establishes that Hittson failed to prove cause to excuse procedural default.

[39]  In addition to the affidavits, Hittson relies on three handwritten notes to support his argument that the State interviewed and obtained exculpatory information from these three witnesses.   (Doc. 56-15 at 18-19; Doc. 59-13 at 93; Doc. 58-1 at 67-68; Doc. 99 at 51-52).   Hittson does not maintain that he first discovered these notes after this Court ordered production of the District Attorney's file.   Hittson's counsel stated that she did not know if "trial counsel ever saw any notes from the DA's file that had the names of any one of these witnesses written on them."   (Doc. 99 at 53).   She explained that Hittson's contention is not that these notes

After this Court granted a stay to allow Hittson to exhaust his *Brady* claims related to Vollmer's psychiatric report and post-arrest letters, Hittson returned to state court and raised, not only these two *Brady* claims, but several others, including his claim that the State withheld the names of, and exculpatory information provided by, Connie Michelle Vollmer, Christopher Landin, and Diana McCarty.   (Doc. 44 at 50-53).

When Hittson returned to this Court, he did not include this *Brady* claim in his amended habeas corpus petition.   (Doc. 45).   However, he briefed this claim, and the Respondent addressed the claim in his brief.   (Docs. 82-84).   When the Court told Hittson's lawyers their petition did not include this claim, they made no effort to amend Hittson's petition.   This alone is sufficient reason to deny this claim.   Nevertheless, because this claim has been briefed, the Court will address the claim, albeit briefly.

As with the other *Brady* claims, the second state habeas court's reasoning in resolving this claim is a little difficult to follow, primarily because of the manner in which the court set forth its cause analysis.   Of the findings upon which the second state habeas court relied to find a lack of cause, two are actually relevant to the substantive *Brady* analysis. For example, the court found, as it did with regard to Vollmer's psychiatric report, that trial counsel could have with reasonable diligence obtained the exculpatory information on their own, i.e., by interviewing the witnesses themselves.   (Doc. 63-1 at 35, 37).   This finding is

_____

were suppressed but "it was the information that the DA had that was not disclosed.   And [she was] using the notes just to provide additional support for the affidavits of those witnesses."   (Doc. 99 at 53).   These notes are vague, at best, and contain no statements from these witnesses.   The first note states:   "Michelle Vollmer-knew of Rossi [and] Vollmer's relationship for a long time;" "Chris Landon Dianna (sic) McCarty 70 Pine Trace Loop Ocala, Fla. 34472 (904) 687-2865 Re: Vollmer—statement made-" (Doc. 56-15 at 18-19). The second states:   "? interview Connie Vollmer? ("ex") Michelle ??."   (Doc. 59-13 at 93).   The second state habeas court found that these two notes came from the District Attorney's file (not the Sealed File) and that Hittson failed to show when he obtained the second note.   (Doc. 63-1 at 36 n.5).   The second state habeas court found that the third note, which states "Michelle Vollmer, 432 Westcliff Cir.," was located in the Sealed File.   (Doc. 58-1 at 67-68; Doc. 63-1 at 36).   The second state habeas court found that these notes do not prove the State ever interviewed these three witnesses.   (Doc. 63-1 at 36).   This is not an unreasonable finding of fact.

amply supported by the record but it is relevant, not to cause, but to the second prong in the *Brady* analysis.[40]   The second state habeas court also found that Hittson failed to establish cause because the three witnesses were available to first state habeas counsel.   (Doc. 63-1 at 35, 37).   This finding is relevant to cause and is supported by the record.

In its cause analysis, the second state habeas court also found that Hittson "failed to prove that the State withheld any documentation regarding interviews" of the three witnesses.   (Doc. 63-1 at 36).   Although the second state habeas court referred only to "documentation," it is clear in context that the court found Hittson failed to prove that the State withheld any information relating to the three witnesses, primarily because Hittson failed to prove that the State ever interviewed the witnesses in any meaningful sense. (Doc. 63-1 at 36).   In short, the second state habeas court found that the State did not have exculpatory information to withhold.

The record clearly supports this finding.   The District Attorney testified that he may have spoken to Vollmer's ex-wife, Connie Michelle Vollmer, but he had no independent recollection of the conversation.   (Doc. 56-11 at 152-54).   Additionally, he had no recollection of speaking with either Landin or McCarty.   (Doc. 56-11 at 154).   The lead investigator, Jon Holland, testified that he had one telephone conversation with Connie Vollmer and she expressed fear of Vollmer and a concern for her safety and the safety of her child.   (Doc. 56-11 at 39).   Other than "just that brief conversation on the phone," he could not "recall that much about Connie."   (Doc. 56-11 at 41).   There is no evidence that Holland ever spoke with either Landin or McCarty.   The second state habeas court found the testimony of the District Attorney and the lead investigator credible.   Credibility

---

[40] In its substantive *Brady* analysis, the second state habeas court also relied upon the fact that trial counsel could have, with reasonable diligence, obtained testimony from these three witnesses.   This finding is supported by the record and provides an additional ground for denying this *Brady* claim.

determinations are presumed to be correct and Hittson has presented no clear and convincing evidence to rebut this presumption, especially in light of the meager evidence regarding these three people contained within the State's files.   *Consalvo v. Sec'y for the Dep't of Corr.,* 664 F.3d 842, 845 (11th Cir. 2011).

Although the second state habeas court used this finding to support its conclusion that Hittson failed to prove cause, its true relevance is to the substantive *Brady* analysis.   If the State never withheld exculpatory information regarding the other witnesses, Hittson has no *Brady* claim.   Therefore, this Court, based on the finding that the State had no exculpatory evidence regarding these three witnesses, concludes that the second state habeas court properly denied this *Brady* claim on the merits.   Because this Court finds that the second state habeas court reasonably found that Hittson failed to prove cause to excuse procedural default and failed to prove suppression, the second element of *Brady,* this Court will not address prejudice and materiality.   *Ward*, 592 F.3d at 1157 (citing *McClesky*, 499 U.S. at 502 (explaining that "[i]t is well established that if the petitioner fails to show cause, we need not proceed to the issue of prejudice"); *Putman v. Turpin*, 53 F. Supp. 2d 1285, 1292 (M.D. Ga. 1999) (citing *United States v. Frady*, 456 U.S. 152 (1982) (explaining that "[a] petitioner must show both cause and prejudice to prevail; therefore a finding by the court that one prong has not been met alleviates the need to analyze the claim under the other prong").

### B.  The *Estelle* Claim

After Hittson rested his case during the sentencing phase of his trial, the trial court allowed the State to call its psychiatrist in rebuttal even though Hittson had not put his mental health experts on the stand.   The psychiatrist offered no opinion testimony, but rather testified about statements Hittson made during the psychiatrist's court-ordered evaluation of

Hittson.   Hittson claims this violated the Fifth, Sixth, and Fourteenth Amendments.

To build a possible mental status defense, trial counsel retained psychologist Michael J. Prewett.   (Doc. 62-2 at 89-97).   Dr. Prewett then associated neuropsychiatrist Norman Moore.   (Doc. 75-16 at 47).   Trial counsel also retained a social worker, Mary Shults, to investigate Hittson's background.   (Doc. 74-8 at 54-55).

On February 5, 1993, trial counsel filed a "Notice of Intent of Defense to Raise Issue of Insanity or Mental Incompetence."   (Doc. 70-2 at 106).   The State immediately responded with discovery seeking the names of Hittson's experts and their reports.   The State also asked the court to order Hittson to "submit to examination and testing by its experts and by experts appointed by and for the Court." (Doc. 70-3 at 12-14).

The issue came to a head at a February 11, 1993, pretrial hearing.   The State argued that unless Hittson submitted to an evaluation by its expert, he could not call his experts.   (Doc. 72-18 at 30).   The District Attorney acknowledged that lay witnesses could testify "as to sanity or competence ..., but no expert unless and until the State is afforded the same opportunity."   (Doc. 72-18 at 30).   The trial court ordered Hittson to submit to an evaluation by the court's expert, psychiatrist Paul Coplin, and the State's psychologist, Dr. Robert Storms.   (Doc. 72-18 at 31).   As discussed in more detail below, the trial court made clear that it was ordering Hittson to submit to the evaluations pursuant to *Estelle v. Smith,* 451 U.S. 454 (1981), and state cases applying *Estelle.*

Hitson's trial counsel questioned whether the State's expert could "get into issues concerning the facts of this case."   (Doc. 72-18 at 36).   The District Attorney responded that "inquiry into what went on that night" might be necessary, but "[i]t's a different matter, surely, if they come into court and say, well, members of the jury, let me tell you what he told me."   (Doc. 72-18 at 38).   The trial court assured trial counsel that the expert would have to

"lay a foundation" for questions about what happened the night of the murder because he is not serving as a "surrogate prosecutor or DA or sheriff's deputy."   (Doc. 72-18 at 36). Thus, the court continued, experts are "not out there to gather evidence against your client on a – factual evidence against your client."   (Doc. 72-18 at 40-41).   The court ruled that if trial counsel became concerned, they could "call a halt to the proceeding," but again cautioned that if they "start calling halts to the proceeding, you know, then you get close to that line of being not – of being uncooperative."   (Doc. 72-18 at 36-37).

Dr. Storms examined Hittson on February 13 and 14, 1993.   Prior to defense counsel's arrival the first day, Dr. Storms gave Hittson a form entitled "NOTICE OF RIGHTS AND RELEASE OF INFORMATION TO PATIENTS REFERRED FOR PRE-TRIAL EXAM OR AFTER A FINDING OF MENTAL INCOMPETENCY FOR TRIAL."   (Doc. 74-11 at 69; Doc. 74-8 at 51; Doc. 74-10 at 63-66).   This document stated:

> 1.   You have the right not to answer questions about your case or your mental condition.
> 2.   Anything you say or do during your examination may be brought out in court, if the court so requires.
> 3.   We will send to the court, your attorney, and the District Attorney a written report giving the staff's opinion about your ability to stand trial and/or your mental condition at the time of the crime for which you are charged.
> 4.   You have the right to telephone or write your lawyer, and to have your lawyer visit you if you are hospitalized.
> 5.   If you are found guilty, information obtained from the exam may be used in deciding your sentence.
> 6.   I understand that I can terminate this interview at anytime.

(Doc. 74-11 at 69).   Hittson signed the form.   (Doc. 74-11 at 69).   At some point after defense counsel arrived, Dr. Storms asked Hittson what he thought of Utterbeck, and Hittson responded that Utterbeck was a "hillbilly" and an "asshole."   (Doc. 74-10 at 57).

On March 1, 1993, as the sentencing phase of the trial began, Hittson's lawyers were in the throes of deciding whether to put their mental health experts on the stand.   Although they had not seen the trial court's and the State's experts' reports, they had reason to

believe their testimony would not be favorable.   Also, of course, they knew that Hittson had told Dr. Storms that Utterbeck was a hillbilly and an asshole.   Their decision was complicated by the fact that the defense psychiatrist, Dr. Moore, had reached conclusions not favorable to Hittson.   Thus, they were concerned that if they called Dr. Prewett and Ms. Shults, it would not only open the door for the court's and the State's experts, but they may run the risk of allowing the State to adduce evidence of Dr. Moore's conclusions.   (Doc. 75-16 at 100-01; Doc. 75-20 at 38-40).

After opening statements in the sentencing phase, trial counsel made a proffer of the testimony of Dr. Prewett and Ms. Shults.   (Doc. 74-8 at 24-39, 54-70).   Trial counsel then moved the court to allow Dr. Prewett to testify but to exclude the State's expert testimony. (Doc. 74-8 at 39-46, 71-75).   The court refused: "[I]f we allow a psychologist or psychiatrist, either one, to testify, at the behest and request of the Defense, then the same is a waiver of the Fifth Amendment Right."   (Doc. 74-8 at 50).   The court's ruling included Ms. Shults; it "would allow [the State] to put a qualified expert, whether it be a psychologist or otherwise, to rebut the conclusions she was trying to infer."   (Doc. 74-8 at 75).

Having lost that battle, trial counsel made sure that their lay witnesses would not open the door to testimony from the State's expert.   Trial counsel requested a bench conference (not because the jury was present, but apparently because spectators were in the courtroom) and the following colloquy took place:

> Mr. Sammons:   I wanted to do this at the bench because I don't want to appear to be an idiot.   If we put up lay witnesses to testify about his character, you won't let them put up Coplin or Storms?
> The Court:   Right.
> Mr. Sammons:   Okay.

(Doc. 74-8 at 77).

The trial court, relying on *Motes v. State*, 256 Ga. 831, 353 S.E.2d 348 (1987), summarized its rulings:   "[I]f the Defense attempts to put up through an expert witness any evidence of Mr. Hittson's mental state, then that's going to open the door for the State to bring in their own expert witnesses as to the defendant's mental state."   (Doc. 74-8 at 78-79).   Trial counsel then offered their own summary:   "[T]he bottom line is, if we put up expert psychological testimony, they can put up expert psychiatric testimony."   (Doc. 74-8 at 82).   When the trial court confirmed this summary, trial counsel announced "we'll just go with lay witnesses."   (Doc. 74-8 at 82).

One of these lay witnesses, Steven Nix, testified that approximately two months after the murder, Hittson told him that Utterbeck "was not ever coming back, that he was dead." (Doc. 74-9 at 43).   He said that Hittson was "kind-of sad, kind-of down, and kind-of depressed" when he relayed this information about Utterbeck.   (Doc. 74-9 at 43).   Trial counsel questioned:

> Q. Well, Mr. Nix, when [Hittson] told you that Mr. Utterbeck would not be coming back, that he was dead, you said he seemed depressed.   Did he also seem remorseful?
> A. Maybe.
> Q. Maybe?
> A. Looking back now, maybe, he might have been.
> Q. Okay.
> A. I didn't notice it at the time.

(Doc. 74-9 at 48).

Based on this testimony, the trial court allowed the State to call Dr. Storms, not to discuss findings, but to testify about Hittson's comments regarding Utterbeck.   (Doc. 74-10 at 48-57).   Over defense objections, Dr. Storms testified that he was a "senior psychologist for the Forensic Services Division at Central State Hospital in Milledgeville," and that "as a forensic psychologist" and "[u]pon Order of this Court," he examined Hittson on February 13 and 14, 1993.   (Doc. 74-10 at 55).   During the course of that examination, he asked Hittson

his opinion of the victim, and Hittson responded that Utterbeck was a "hillbilly" and an

"asshole."   (Doc. 74-10 at 57).

Although the State then rested, the trial court expressed concern that there had been

no testimony that Hittson had been advised of his rights prior to the court-ordered

examination by Dr. Storms.   Accordingly, the trial court allowed the State to reopen its case,

and Dr. Storms testified that he informed Hittson of his rights.   (Doc. 74-10 at 76).   He also

testified, "Let me preface that the following statements, so that the jury understands that we

are a neutral party that responds only to court orders, and our reports are primarily for a

judge."   (Doc. 74-10 at 76).

Hittson claims that the admission of Dr. Storms' testimony violated his Fifth and Sixth

Amendment rights.[41]   The Georgia Supreme Court resolved these claims adversely to

Hittson, but that court's ruling on Hittson's Fifth Amendment claim was overruled in *Nance v.*

*State*, 272 Ga. 217, 220-21 n.2, 526 S.E.2d 560, 565-66 n.2 (2000).[42]

Hittson claims that the Georgia Supreme Court's adjudication of this claim involved

an unreasonable application of *Estelle v. Smith,* 451 U.S. 454 (1981).   In *Estelle,* a Texas

state court ordered Smith to submit to a psychiatric examination by a doctor retained by the

State.   Smith had not placed in issue his mental health, and his attorneys may not have

---

[41] Hittson also claims that Dr. Storms' testimony violated his Fourteenth Amendment due process rights.   The Georgia Supreme Court denied that claim as well, but a detailed discussion is unnecessary because Hittson has not pointed to any "clearly established Federal law" on the issue.   28 U.S.C. § 2254 (d)(1).   The two cases he cites, *Raley v. Ohio*, 360 U.S. 423 (1959) and *Lankford v. Idaho,* 500 U.S. 110 (1991), are completely inapposite.   In *Raley*, the Court held that a State may not entrap a citizen by convicting him "for exercising a privilege which the State had clearly told him was available to him."   *Raley*, 360 U.S. at 426.   In *Lankford*, the Court held that a criminal defendant and his counsel must be given adequate notice that the judge is contemplating the imposition of the death penalty."   *Lankford*, 500 U.S. at 127.   Neither holding is relevant here.

[42] Hittson does not argue AEDPA's deference should not apply to the Georgia Supreme Court's overruled ruling on his Fifth Amendment claim. This Court has found no authority addressing whether deference applies in such a situation. Therefore, this Court has afforded the Georgia Supreme Court's decision on this issue deference even though it has been overruled.

been informed of the examination.   *Estelle,* 451 U.S. at 471 n.15.   In any event, Smith was

not Mirandized.   *Id.* at 467.   The State's psychiatrist concluded that Smith was a severe

sociopath and the trial court allowed the psychiatrist to testify about Smith's "future

dangerousness" at the penalty phase of the trial.[43]   *Id.* at 458-60.   The Supreme Court held

this testimony violated Smith's Fifth Amendment rights.   Of relevance here, the Supreme

Court noted the limited context of Smith's examination:   "[The trial court] ordered a

psychiatric evaluation of respondent for the limited, neutral purpose of determining his

competency to stand trial, but the results of that inquiry were used by the State for a much

broader objective that was plainly adverse to respondent."   *Id.* at 465.   Smith had not made

his mental status an issue, yet the State nevertheless used the results of the mandated

evaluation to meet its burden of proving future dangerousness.   The Supreme Court's

holding was clear:   "A criminal defendant, who neither initiates a psychiatric evaluation nor

attempts to introduce any psychiatric evidence, may not be compelled to respond to a

psychiatrist if his statements can be used against him at a capital sentencing proceeding."

*Id.* at 468.

    With regard to the Sixth Amendment, the Supreme Court in *Estelle* framed the issue

this way:   "[W]hether a defendant's Sixth Amendment right to the assistance of counsel is

abridged when the defendant is not given prior opportunity to consult with counsel about his

participation in the psychiatric examination."   *Id.* at 470 n.14.   The Supreme Court held that

Smith's right to counsel had been violated because his attorneys had not been notified that

the examination would address the issue of future dangerousness, and thus Smith "was

denied the assistance of his attorneys in making the significant decision of whether to submit

---

[43] In Texas, juries in capital cases must determine whether a "defendant would commit criminal acts of violence
that would constitute a continuing threat to society." *Estelle*, 541 U.S. at 458 (internal citations omitted).   The
State has to prove "future dangerousness" beyond a reasonable doubt.   *Id.*

to the examination and to what end the psychiatrist's findings could be employed."   *Id.* at

471.

The Supreme Court next addressed this issue in *Buchanan v. Kentucky*, 483 U.S.

402 (1987).   The parties jointly requested that Buchanan undergo a psychiatric evaluation

pursuant to a state law involving involuntary hospitalization for psychiatric treatment.

Buchanan raised the defense of "extreme emotional disturbance," and at trial his sole

witness, a social worker, "read to the jury from several reports and letters dealing with

evaluations of [Buchanan's] mental condition."   *Buchanan,* 483 U.S. at 408-09.   On

cross-examination, the State, over Buchanan's objection, asked the social worker to read

from the jointly requested psychiatric evaluation.   On appeal, Buchanan argued that his

Sixth Amendment right to counsel had been violated because his lawyers could not have

anticipated that the evaluation would be used to attack his extreme emotional disturbance

defense.[44]   The Supreme Court rejected this argument:

> [Buchanan], however, misconceives the nature of the Sixth Amendment right
> at issue here by focusing on the use of Doctor Lange's report rather than on
> the proper concern of this Amendment, the consultation with counsel, which
> [Buchanan] undoubtedly had.   Such consultation, to be effective, must be
> based on counsel's being informed about the scope and nature of the
> proceeding.   There is no question that [Buchanan's] counsel had this
> information.   To be sure, the effectiveness of the consultation also would
> depend on counsel's awareness of the possible uses to which [Buchanan's]
> statements in the proceeding could be put.   Given our decision in [*Estelle*],
> however, counsel was certainly on notice that if, as appears to be the case, he
> intended to put on a "mental status" defense for petitioner, he would have to
> anticipate the use of psychological evidence by the prosecution in rebuttal.   In
> these circumstances, then, there was no Sixth Amendment violation.

*Id.* at 424-25.   Thus, the question is whether a defendant's lawyers are informed about the

---

[44]  Buchanan also argued that his Fifth Amendment rights had been violated.   However, the social worker was
not asked to read to the jury any statements made by Buchanan concerning his alleged crimes.   Rather, she
recounted only general observations about Buchanan's mental state, and the Court held that any introduction
of these statements "for this limited rebuttal purpose does not constitute a Fifth Amendment violation."
*Buchanan*, 483 U.S. at 424.

scope and nature of the evaluation.   To provide effective counsel, a lawyer must know how her client's statements could be used.   However, because *Estelle* made clear that the prosecution can use a defendant's psychological evaluation to rebut a mental status defense, Buchanan's lawyers had that notice.

*Estelle* Fifth Amendment and Sixth Amendment claims are intertwined and it is appropriate to discuss those claims together.   The Georgia Supreme Court's relevant reasoning disposing of Hittson's Fifth Amendment claim is found in two sentences:   "The record supports the trial court's finding that *Miranda* warnings were properly administered, that Hittson voluntarily waived his right to remain silent, and that he willingly participated in the evaluation.   The record does not support Hittson's contention that he waived his Fifth Amendment privilege only to the extent of permitting an evaluation to rebut a possible insanity defense."   *Hittson*, 264 Ga. at 684, 449 S.E.2d at 591.   This is the holding overruled in *Nance.*

Factually, it is not clear from the Georgia Supreme Court's opinion how the court was able to conclude that the "record" revealed that Hittson generally waived his Fifth Amendment rights.   The court's reference to *Miranda* warnings could only mean the form Hittson signed at the beginning of Dr. Storms' examination and before trial counsel arrived.[45]

---

[45] The State's brief in the direct appeal is very clear in this regard.   No doubt recognizing that *Estelle* and its progeny contemplate only a limited Fifth Amendment waiver, the State argued that Dr. Storms successfully secured a general waiver of Hittson's Fifth Amendment rights.   (Doc. 75-1 at 16, 21, 23, 26).   That was the Respondent's position here, but it is a position he understandably found not particularly comfortable:

> The Court:        So the [Respondent's] position is that when you have an *Estelle* situation, which is what the trial judge set up, put in his order, you've got to appear for this, cites *Motes.* Well, first at that point that's a limited waiver, right?
> Ms. Graham:      It can be, yes.
> The Court:        It's got to be.   And it's the [Respondent's] position that because the psychiatrist had him sign a general waiver before his lawyer got there that we now have a general waiver?
> Ms. Graham:      Yes.   Again I think this claim again comes down to your analysis under *[Brecht v. Abrahamson*, 507 U.S. 619 (1993)].

The court made no reference to the facts leading to the examination; i.e., Hittson's objection to the examination, the court's discussion with counsel, and the trial court's order that Hittson submit to the examination.   That order was very clear:

> WHEREAS the sanity and mental competency of this Defendant has been called into question, and a Notice regarding the same having been filed, this Court finds it is appropriate for an evaluation of this defendant to be conducted.   This evaluation is to be done by psychologists and/or psychiatrists of the State's choosing, pursuant to the State's entitlement to the same per Motes v. State, 256 Ga. 831, 832 (1987), citing Estelle v. Smith, 451 U.S. 454, 101 S. Ct. 1866 (1981).

(Doc. 60-1 at 101).   The significance of the citation to *Motes* is discussed below; the significance of the citation to *Estelle* is obvious.   Nor did the supreme court discuss the events after the evaluation confirming that Hittson had waived his Fifth Amendment rights only in the event he put experts on the stand, i.e., trial counsel's attempt to use expert testimony but still barring Dr. Storms' testimony, and, when that failed, foregoing any expert testimony when the trial court ruled that Dr. Storms could not testify if they called only lay witnesses.   These facts make clear that Hittson did not generally waive his Fifth Amendment rights.   Therefore, the only factual basis for the conclusion that Hittson generally waived his Fifth Amendment rights was the general waiver secured by Dr. Storms before Hittson's counsel arrived for the examination.

   The legal basis for the Georgia Supreme Court's conclusion that Hittson's Fifth Amendment waiver was general is also difficult to discern.   At the time it decided *Hittson,* the Georgia Supreme Court had addressed the limited nature of an *Estelle*-waiver.   Four years before it decided *Hittson*, the Georgia Supreme Court, in *Motes v. State*, 256 Ga. 831, 353 S.E.2d 348 (1987), addressed the extent of an *Estelle* Fifth Amendment waiver.   The Court's understanding of *Estelle* was clear:

---

In other words, the Respondent's real argument is that the error was harmless.   (Doc. 99 at 49-50).

The United States Supreme Court in *Estelle v. Smith*, 451 U.S. 454, 101 S. Ct. 1866, 68 L.Ed. 2d 359 (1981), held that a defendant who introduces expert psychiatric testimony in support of an insanity defense, waives his right to remain silent to the extent that he must make himself available to the state's psychiatric expert for examination.   This **limited waiver** of a defendant's fifth amendment rights simply amounts to a determination that if a defendant wants to tell his story to a jury through the mouth of an expert, the state should have an equal opportunity to tell that story through the mouth of an expert, and that the state could not practically possess this opportunity unless their expert gained access to the defendant.   *Estelle* in no way holds that the assertion of an insanity defense will result automatically in the absolute waiver of the right to remain silent.

*Id.* at 832, 353 S.E.2d at 349 (emphasis added).

In *Motes*, the Georgia Supreme Court addressed *Estelle* in the context of an interlocutory appeal from a trial court ruling requiring a defendant to submit to an evaluation by a court-appointed expert.   When the defendant refused to talk to the expert, the trial court barred the defendant from introducing any, not just expert, evidence relating to the issue of insanity.   The trial court based its order "upon the premise that an insanity plea constitutes a waiver of Fifth Amendment rights, and that any invocation of the right to remain silent constitutes a waiver of the right to present an insanity defense."   *Id.* at 831, 353 S.E.2d at 349.   However, the defendant in *Motes,* although intending to pursue an insanity defense, did not plan to use expert testimony.   Consequently, the Georgia Supreme Court reversed.   The court held that the limited waiver of the right not to incriminate oneself arises only if the defendant intends to use expert testimony to prove insanity.   In that event, "the state must be allowed the same privilege and the defendant must cooperate, in light of her partial waiver of the right to remain silent."   *Id.* at 832, 353 S.E.2d at 350.

Thus, the state of the law at the time the Georgia Supreme Court decided *Hittson* was clear.   A defendant wishing to present expert testimony to support an insanity defense did not generally waive his Fifth Amendment rights.   He waived those rights only to the extent

that he must submit to an evaluation by a prosecution expert if he intended to support his insanity defense with expert testimony.[46]

Factually and legally, this is precisely what happened in *Hittson*.  Citing *Estelle* and *Motes,* the trial court ordered Hittson to submit to Dr. Storms' evaluation.   Yet the Georgia Supreme Court held the general waiver signed by Hittson at Dr. Storms' request and without the benefit of counsel trumped the limited waiver that occurred when the court ordered him to submit to that evaluation.

The Respondent *now* does not dispute that the Georgia Supreme Court erred in its resolution of Hittson's *Estelle* Fifth Amendment claim.   Less than a year after its decision in *Hittson*, the Georgia Supreme Court rejected, on interlocutory appeal, a defendant's claim that his Fifth Amendment rights would be violated "if he is required to cooperate in a free-ranging evaluation by a State mental health expert who may then testify regarding matters beyond the scope of mitigation evidence, such as [his] state of mind at the time of the murders."   *Abernathy v. State*, 265 Ga. 754, 755, 462 S.E.2d 615, 617 (1995).   But, the Georgia Supreme Court made clear, "we reiterate our holding in *Jenkins* [*v. State,* 265 Ga. 539, 458 S.E.2d 477 (1995)] that the State may offer expert mental health testimony only in the sentencing phase and strictly in rebuttal of the expert mental health evidence offered in mitigation by the defense."   *Id.*

Any doubt that *Hittson* unreasonably applied *Estelle* was eliminated in *Nance v. State,* 272 Ga. 217, 526 S.E.2d 560 (2000).   There, the trial court ordered Nance to submit to a mental health examination after he announced his intention to present expert mental

---

[46] Of course, the Supreme Court in *Estelle*, in its holding, did not address a court-ordered psychiatric examination to rebut expert testimony in support of a mental status defense.   Yet, as the Georgia Supreme Court acknowledged in *Motes*, the reasonable application of *Estelle* clearly establishes that a defendant ordered to submit to a psychiatric examination to allow the State to rebut his mental status defense does not generally waive his Fifth Amendment rights.   Nor is this Court suggesting that the Georgia Supreme Court's discussion of *Estelle* is part of the clearly established law governing Hittson's petition.   Again, the point is that it is clearly established that an *Estelle* waiver is a limited waiver.

health testimony in the sentencing phase of his trial.   The examiner, like Dr. Storms, read

Nance his constitutional rights, Nance signed a waiver form, and his attorneys were present

throughout the examination.   During the examination, Nance said that he had used drugs

and drank alcohol the night of the offense.   Over Nance's objection, the State called the

doctor to testify to these statements during the guilt-innocence phase of the trial.   The

doctor was not qualified as an expert and, indeed, there was no reference to the fact that she

was a doctor.   Citing pre-*Hittson* authority and *Estelle*, the Georgia Supreme Court

acknowledged that the rationale behind requiring a defendant who intends to present mental

health expert testimony to submit to an examination by a State expert arises from "'the

State's overwhelming difficulty in responding to the defense psychiatric testimony without its

own psychiatric examination of the accused and by the need to prevent fraudulent mental

defenses.'"   *Id.* at 219, 526 S.E.2d at 564-65 (quoting *Lynd v. State*, 262 Ga. 58, 64, 414

S.E.2d 5, 11 (1992)).   This principle draws a "fair balance between the interests of the

State, the regard for the function of the courts to ascertain the truth, and the scope of a

defendant's privilege against self-incrimination."   *Id.,* 526 S.E.2d at 565.   Again citing

*Estelle*, the court noted that "the purpose of the rule requiring the defendant to submit to a

State mental health examination under these circumstances is to permit the State to

formulate a response or a rebuttal to the testimony of the defendant's mental health expert."

*Id* at 219-20, 526 S.E.2d at 565.   However, when "the State's expert stripped off her

medical title and testified as a lay witness about what the defendant told her," the State

"subverted" that purpose.   *Id.* at 220, 526 S.E.2d at 565.   "We therefore restate our holding

in *Abernathy* that when a defendant must submit to a court-ordered mental health

examination because he wishes to present expert mental health testimony at his trial, the

State expert may only testify in rebuttal to the testimony of the defense expert or to rebut the

testimony of the defendant himself." *Id.* The Georgia Supreme Court then overruled *Hittson* to the extent it "authorized a State expert to testify in response to lay witness testimony that the defendant was remorseful...." *Id.* at 220 n.2, 526 S.E.2d at 565 n.2.[47]

To the extent that the Georgia Supreme Court in *Hittson* made a factual determination when it concluded that the "record" did not support a finding that Hittson's Fifth Amendment waiver was limited, rather than general, its decision "was based on an unreasonable determination of the facts in light of the presented evidence in the State court proceeding."[48] 28 U.S.C. § 2254(d)(2). The facts in this regard are undisputed and allow but one conclusion. Pursuant to the trial court's order and the colloquy between the court and counsel, Hittson did not generally waive his Fifth Amendment rights. There is no factual basis for concluding that the limited waiver was converted to a general waiver simply because the State's psychiatrist had Hittson sign a form waiver when his counsel were not present.

---

[47] It is appropriate to note another serious anomaly in the order drafted by the Respondent's lawyers. At the evidentiary hearing in the second state habeas action, the court addressed the "*Nance* claim:"

| The Court: | I want to go back right quick. On the first claim, the *Nance* claim- |
| Mr. Dunn: | Yes, Your Honor? |
| The Court: | - Ms. Graham, the way I understand it, just to make sure I'm clear, we all agree there was a *Nance* violation but that y'all are going to contend that it's harmless error, and you're going to contend that it's not? |
| Mr. Dunn: | Correct, Your Honor. |
| The Court: | Am I correct? |
| Ms. Graham: | Yes, Your Honor. |

(Doc. 63-8 at 32).

For whatever reason, the Respondent's lawyers took a much different position when they drafted the order denying relief. The Respondent's order concluded that *res judicata* barred the "*Nance* claim," and, alternatively, *Nance* could not be applied retroactively because it merely narrowed a "state procedural rule." (Doc. 63-1 at 13-15). Arguably, that the court signed an order that directly conflicted with its understanding of the "*Nance* claim" and the Respondent's express acceptance of the court's understanding, suggests that the court did not read the order when counsel submitted it some 13 months after the evidentiary hearing. Moreover, the notion that *Nance* simply narrowed a rule of procedure seems farfetched. *Nance* held that *Hittson* misapplied *Estelle*. *Estelle* is not a mere rule of procedure.

[48] The Court understands that appellate courts do not make findings of fact and perhaps, strictly speaking, may not make factual determinations of the kind contemplated by 28 U.S.C. § 2254(d)(2). *Holsey*, 694 F. 3d at ____. However, the Georgia Supreme Court either made a factual determination that Hittson generally waived his Fifth Amendment rights or it relied on an implicit finding to that effect by the trial court.

To the extent that the Georgia Supreme Court reached a legal conclusion that Hittson generally waived his Fifth Amendment rights, that decision "involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). At the time of the Georgia Supreme Court's decision, the reasonable application of *Estelle* clearly required the conclusion that a defendant raising a mental status defense waived his Fifth Amendment rights, as the Georgia Supreme Court held in *Motes,* only "to the extent that he must make himself available to the state's psychiatric expert for examination." 256 Ga. at 832, 353 S.E.2d at 349.[49]

The Georgia Supreme Court's discussion of Hittson's Sixth Amendment claim was also short. Trial counsel were aware of the "scope and nature" of the evaluation, and were present during most of the evaluation. Trial counsel were also informed by the trial court that it would be available in the event issues arose during the evaluation. Finally, Hittson's attorneys "counseled" with Hittson before the evaluation. The Georgia Supreme Court held that "[u]nder these circumstances, Hittson's Sixth Amendment right to counsel was not violated within the meaning of *Estelle v. Smith*, *supra.*" *Hittson*, 264 Ga. at 685, 449 S.E.2d at 592.

Again, it is difficult to tell what the Georgia Supreme Court meant. Clearly trial counsel were aware of the "scope and nature" of the evaluation, but that hardly supports the Georgia Supreme Court's conclusion. The scope and nature and the possible use of the evaluation were determined by the trial court's written order, citing *Motes* and *Estelle,* and

---

[49] It is perhaps not surprising that neither Hittson nor the Respondent have found much authority addressing whether an *Estelle*-waiver can be converted to a general waiver when a defendant is Mirandized when he shows up for the court-ordered evaluation. However, the Third Circuit has addressed this scenario and held that the admission of the expert's testimony, not to rebut the psychiatric evidence, but "simply to repeat incriminating statements that [the defendant] had made in the interview" was an "unreasonable application [*Estelle*] to the facts or an unreasonable failure to extend [*Estelle*] to the facts." *Gibbs v. Frank,* 387 F.3d 268, 275 (3d Cir. 2004).

oral pronouncements directing Hittson to appear for evaluation.   In short, as far as the Fifth Amendment was concerned, Hittson would waive his rights only in accordance with *Estelle* and *Motes.*   The State's expert could testify only if Hittson's experts testified.   That is what the trial court told his lawyers.   Yet, according to the supreme court, the "scope and nature" of the evaluation was that Hittson would generally waive his Fifth Amendment rights and the State's expert could testify even though Hittson's experts did not.   *Id.*   Not only were trial counsel not advised of that "scope and nature," the trial court told them just the opposite – the "scope and nature" and use of the evaluation were governed by *Estelle* and *Motes.*

In *Estelle,* Smith's attorneys were not aware that the court-ordered examination would address the issue of future dangerousness, and thus Smith unconstitutionally "was denied the assistance of his attorneys in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed."   451 U.S. at 471.   On the other hand, in *Buchanan,* Buchanan's right to counsel had not been impinged because his attorneys had been informed of the scope and nature of the examination and his lawyers were thus "on notice that if ... he intended to put on a 'mental status' defense for petitioner, he would have to anticipate the use of psychological evidence by the prosecution in rebuttal."   *Buchanan,* 483 U.S. at 425.   Hittson's lawyers were never told that Hittson would be generally waiving his Fifth Amendment rights and that his statements to Dr. Storms could be used against him regardless of whether he put on a mental status defense.

Certainly there was no notice, from Supreme Court cases or otherwise, that Dr. Storms would be allowed to testify as a fact witness and merely repeat Hittson's incriminating statements.   In fact, the trial court specifically assured defense counsel that Dr. Storms was not serving as a "surrogate prosecutor or DA or sheriff's deputy" and that he

was "not out there to gather evidence against your client on a – factual evidence against your client." (Doc. 72-18 at 36, 40-44). Likewise, the District Attorney informed defense counsel that Dr. Storms may inquire into what happened the night of the murder, but "[i]t's a different matter" should he "come into court and say, well, members of the jury, let me tell you what he told me." (Doc. 72-18 at 38). Thus, the Georgia Supreme Court's conclusion that Hittson's Sixth Amendment right to counsel was not violated involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1).

In Hittson's direct appeal, the Georgia Supreme Court did not address the issue of whether the admission of Dr. Storms' testimony was harmless error. That issue was addressed only by the second state habeas court.[50] Its reasoning and conclusion are found in one paragraph:

> During the sentencing phase Petitioner put on twenty witnesses, spanning two days. Petitioner's witnesses consisted of a coach, life-long friends, military peers and superiors, and family members. These twenty witnesses testified about their opinions of Petitioner's non-violence, gullibility, alcohol problems, and pleaded for mercy on behalf of Petitioner. Dr. Storms was the State's only witness during the sentencing phase. Thus, given the overwhelming evidence of guilt, the minor evidence presented in aggravation and the considerable evidence presented in mitigation, this Court finds that Dr. Storm's testimony did not have a "substantial and injurious effect or influence in determining the jury's verdict" and was therefore harmless.

(Doc. 63-1 at 16). Thus, as it did in its *Brady* materiality analysis, the court relied on the "overwhelming evidence of guilt" to justify its finding of harmless error. This Court will

---

[50] The second state habeas court ruled that Hittson's *Estelle* claims were barred by res judicata and that the Georgia Supreme Court's overruling of *Hittson* in *Nance* could not be applied retroactively. Those rulings are not before this Court because this Court's review is limited to "deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citations omitted). The Court notes, however, that the second state habeas court rejected Hittson's retroactivity argument because "*Nance* did not set forth a new rule of constitutional dimension, but merely narrowed an existing rule of criminal procedure." (Doc. 63-1 at 12). That characterization of *Nance,* as noted, is suspect.

accept, as it did in its review of the court's *Brady* materiality analysis, that the second state habeas court, when it referenced "overwhelming evidence of guilt," actually meant the overwhelming evidence of the horror of Hittson's crime considered by the jury during the sentencing phase of trial.   However, in its *Brady* materiality analysis, the second state habeas court's order at least weighed this overwhelming evidence with the suppressed evidence.   In its harmless error analysis, it provides no analysis of the impact or effect of Dr. Storms' testimony, simply labeling it "minor evidence ... in aggravation."[51]   (Doc. 63-1 at 16).   Determining whether Dr. Storms' testimony was only "minor" requires somewhat more discussion, conducted under the appropriate standard of review.

With regard to the standard of review, it is appropriate to note yet another problem in the second state habeas court's order.   Because Hittson was asserting error based on his federal constitutional rights in the second state habeas court, he logically enough cited the harmless error standard formulated by the United States Supreme Court in *Chapman v. California*, 386 U.S. 18 (1967).   (Doc. 62-25 at 15 n.4).   The second state habeas court's order refused to apply *Chapman,* concluding that "the United States Supreme Court held that the standard for determining whether habeas relief must be granted is not beyond a reasonable doubt," but rather the standard applied in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), a standard "more favorable to and 'less onerous' on the" Respondent, and "thus less favorable to" Hittson.   (Doc 63-1 at 15-16); *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1307 (11th Cir. 2012).

Apparently, the Respondent's lawyers thought that because the second state habeas court was sitting as a habeas court, they should skip the *Chapman* standard in the order they

---

[51] This lack of discussion about the facts that led the court to conclude Dr. Storms' testimony was minor evidence of aggravation is not fatal to the court's finding of harmless error.   Faulty analysis or even no analysis, the state habeas court's factual findings are presumed correct.

drafted.   However, *Brecht* held that *federal* habeas courts reviewing *state* criminal

convictions must apply the less petitioner-friendly *Brecht* standard.   The Supreme Court did

not hold that petitioners who establish federal constitutional error in state habeas

proceedings are subject to the *Brecht* harmless error standard.   *See Duest v.* Singletary,

997 F.2d 1336, 1338 n.2 (11th Cir. 1993) (explaining that *Brecht* is the standard for harmless

constitutional error in federal habeas corpus cases but "[t]he harmless error standard for

constitutional violations in all other situations remains the longstanding test of Chapman.").

Indeed, the second state habeas court was the court of initial review on the question of

whether the claimed *Estelle* violation constituted harmless error; that issue was not

addressed by the Georgia Supreme Court.   Thus, clearly the second state habeas court

should have applied *Chapman*.[52]   *Trepal v. Sec'y, Fla Dep't of Corr.*, 684 F.3d 1088, 1112

n.27 (11th Cir. 2012) (citing two state court habeas corpus decisions and explaining that the

*Brecht* standard "does not apply to state courts' review of their own convictions" as they

should "apply the more petitioner-friendly *Chapman* standard").

Regardless of the standard applied by the second state habeas court, this Court

reviews the unconstitutional admission of Dr. Storms' testimony using the *Brecht* harmless

error standard.[53]   *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007).   Under *Brecht*, "a federal

constitutional error is harmless unless there is 'actual prejudice,' meaning that the error had

a 'substantial and injurious effect or influence' on the jury's verdict."   *Mansfield*, 679 F.3d at

---

[52] When deciding state habeas appeals, the Georgia Supreme Court applies the *Chapman*, not the *Brecht*, harmless error standard.   *See Brown v. Baskin*, 286 Ga. 681, 685, 690 S.E.2d 822, 826 (2010); *Brewer v. Hall*, 278 Ga. 511, 513, 603 S.E.2d 244, 247 (2004); *Hicks v. Schofield*, 278 Ga. 159, 160, 599 S.E.2d 156, 157 (2004) (Chief Justice Fletcher dissenting from the denial of petitioner's motion for certificate of probable cause to appeal and explaining that the Eleventh Circuit's previous decision that the constitutional error was harmless did not bind the Georgia Supreme Court because state courts are "required to apply" the *Chapman* harmless error standard, not the *Brecht* standard that the Eleventh Circuit used).

[53] This means that Hittson never had the benefit of the *Chapman* standard of review.

1307 (quoting *Brecht*, 507 U.S. at 637).   The Court must find that there is "more than a reasonable possibility that the error contributed to the conviction or sentence."   *Mason v. Allen*, 605 F.3d 1114, 1123 (11th Cir. 2010) (quoting *Horsley v. Alabama*, 45 F.3d 1486, 1493 (11th Cir. 1995)) (internal quotation marks omitted) (brackets omitted).   To determine if the error affected the sentence, the Court considers the error in the context of the entire trial.   "The question turns on whether the Court can 'say, with fair assurance,' that the [sentence] 'was not substantially swayed by the error.'"   *Trepal*, 684 F.3d at 1114 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995)).   The Supreme Court has explained:

> "If, when all is said and done, the [court's] conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand. ... But, if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.   The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error.   It is rather, even so, whether the error itself had substantial influence.   If so, *or if one is left in grave doubt*, the conviction cannot stand."

*O'Neal*, 513 U.S. at 437-38 (quoting *Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946) (emphasis in original).

Thus, Hittson does not have to prove that but for Dr. Storms' testimony, the jury would not have imposed the death penalty.   *See Duest*, 997 F.2d at 1338.   Nor must he make the showing required to establish materiality under *Brady;* i.e., that there is a "reasonable probability" had the error not occurred "the result of the proceeding would have been different."   *United States v. Bagley*, 473 U.S. 667, 682 (1985) (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984) (internal quotation marks omitted)).   "[T]he *Brady* materiality standard 'impose[s] a higher burden on the [criminal] defendant' than" the *Brecht* standard.   *Trepal,* 684 F.3d at 1113 (quoting *Kyles v. Whitley*, 514 U.S. 419, 436 (1995)).

However, when making the harmless error determination, the Court views "the evidence through the lens of AEDPA."   *Mansfield*, 679 F.3d at 1309.   Thus, the second state habeas court's factual findings are presumed correct and Hittson bears the burden of rebutting the presumption by clear and convincing evidence.   *Id.*   This Court must, however, make a *de novo* determination whether the constitutional error "'had [a] substantial and injurious effect or influence in determining the jury's verdict.'"   *Id.* at 1313 (quoting *Brecht,* 507 U.S. at 637).   To make this determination, the Court reviews the entire record. *Id.* at 1315.

As the second state habeas court repeatedly acknowledged, Hittson's trial counsel pieced together a fairly effective case in mitigation.   Trial counsel presented "considerable evidence" to support its theme that Hittson "exhibited a pattern of alcohol dependence and abuse and had been psychologically or personality-wise dependent to ... or ... submissive psychologically to ... Vollmer," who was an intelligent, violent, and corrupt manipulator. (Doc. 63-1 at 16; Doc. 56-9 at 85; Doc. 74-9 at 55).   Numerous witnesses testified that Hittson grew up in an unaffectionate family that did not care about him and that he was a dim-witted, impressionable, non-violent, generous, and trustworthy follower who abused alcohol.   (Doc. 74-8 at 85-151; Doc. 74-9 at 1-78; Doc. 74-10 at 12-31).

The evidence also showed that, following his return from Georgia, Hittson just "deteriorated."   (Doc. 74-9 at 9-10).   Conversely, Vollmer was "just the same old guy," who continued to have a fascination with murder and dismemberment and even laughed when he, on numerous occasions, "jokingly" told his shipmates that he had killed Utterbeck. (Doc. 74-9 at 10-13, 21).   Additionally, Hittson accepted responsibility for the crime, confessed to his role in Utterbeck's murder early in the investigation, and fully cooperated

with law enforcement.   Investigator Wendell Hall, who was one of the State's witnesses during the guilt/innocence phase of the trial, testified that when Hittson was brought in for questioning he "appeared as someone that was very troubled," who had "been involved in something he was not extremely proud of, something that he had been a part of that he might not have necessarily been the instigator of…."   (Doc. 74-4 at 62-63).   During that interview, Hittson provided a detailed confession of the crime.   (Doc. 74-4 at 62-64). Hittson subsequently took law enforcement officers to the locations where Utterbeck's remains were buried, and voluntarily told them where they could find the baseball bat and other instruments used in the crime.   (Doc. 74-4 at 9, 39-40).   Meanwhile, the jury heard no evidence, and there was no evidence, that Vollmer had acknowledged his guilt.[54]

    As the sentencing phase of trial began, defense counsel clearly recognized the significance of Hittson's statements to Dr. Storms and played every card they could to keep him from testifying.   In the end, as discussed above, the only way defense counsel could keep Dr. Storms off the stand was to forego the presentation of their own mental health experts, which they ultimately decided to do.

    Hittson's twenty lay witnesses and the letters Vollmer wrote before Utterbeck's death painted the picture defense counsel wanted the jury to see.   Vollmer was evil, and he manipulated Hittson.   Vollmer was far more intelligent than Hittson, who was dimwitted at best.   Only under Vollmer's influence would Hittson have ever participated in such a horrific crime.   Away from Vollmer, Hittson was a "harmless guy" who was just "manipulated ... into doing something that he would have never done."   (Doc. 75-17 at 62).   When trial counsel rested their case in the sentencing phase of trial, there was no evidence that Hittson, except

---

[54] On the contrary, as his post-arrest letters reveal, Vollmer was still scheming and manipulating.

when under the influence of Vollmer, could ever have done what he did.   Defense counsel had shown that the crime was completely out of character for Hittson.   (Doc. 75-18 at 113). Perhaps just as importantly, the prosecution would have no evidence in rebuttal.   The last and only evidence the jury would hear during the sentencing phase of the trial would be Hittson's evidence in mitigation.

That drastically changed when the trial court ruled Dr. Storms could testify.   Dr. Storms, claiming to be a neutral party testifying at the behest of the court, rather than an expert employed by the State, explained that he was "the senior psychologist for the Forensic Services Division at Central State Hospital" and that he had examined Hittson just sixteen days earlier, which was only two days before the start of Hittson's trial for the murder of Utterbeck.   (Doc. 74-10 at 55).   Dr. Storms testified that during the examination, Hittson stated that Utterbeck was a "hillbilly" and an "asshole."   (Doc. 74-10 at 57).

The fact that the jury heard Dr. Storms' testimony last carries a significance that any trial lawyer can appreciate.   However, it requires no trial experience to understand that Dr. Storms' testimony shifted the field dramatically.   First, according to Hittson's mitigation evidence, Hittson's horrible conduct was an aberration and something that he would never have done on his own.   As horrific as his crime was, nothing in his life suggested that he was capable of such conduct.   Thus, something unique to the circumstances that night had to have led him to commit the crime.   Dr. Storms' testimony effectively undercut that image. Now, Hittson was a man who, approximately ten months after Utterbeck's murder and just a few days before his trial for that murder, referred to the victim in derogatory and demeaning terms.   According to the court's expert (as far as the jury knew), Hittson was no longer the mild-mannered, manipulated, weak man his lawyers portrayed him to be.   Instead, he was

a brazen, unrepentant man who casually told the court's neutral expert that Utterbeck, the man he brutally murdered and dismembered, was an asshole and a hillbilly.

Second, Dr. Storms' testimony flatly contradicted the defense theory that Hittson did what he did only because of Vollmer's overpowering and evil influence.   By the time he saw Dr. Storms, Hittson had been free from Vollmer's influence for many months.   Clearly, it was not because of Vollmer that Hittson was so callous that he could refer to his victim as a hillbilly and an asshole.   Instead, this was evidence of Hittson's own evil and unremorseful character, and it came, according to Dr. Storms, directly from Hittson's own mouth.

While Dr. Storms' testimony was brief, it was effective.[55]   The State recognized just how effective and made sure the testimony remained center stage throughout closing arguments.   During its closing, the State displayed the words "asshole" and "hillbilly" on "big poster boards" alongside photographs of Utterbeck's mutilated remains and described both as the "reality" versus the false image of Hittson that the defense witnesses sought to dupe the jury into believing:

> [Y]ou've heard one of the defense witnesses talk about, well, as I think about it now he was remorseful. ... Well, members of the jury, there's your remorse. (Referring to easel.)   As ... late ... as three weeks ago this is this defendant's response when asked about Conway Utterbeck being an innocent human being.   Conway was a hillbilly, he was an asshole.   Is that remorse?   What does your common sense tell you? What does reason tell you?   Members of the jury, there's no remorse here.   On this stage, or in this stage, if you will, he will come and talk about remorse.   But that's the reality every bit as much as every picture up here is the reality.

(Doc. 74-10 at 92-93; Doc. 56-10 at 13-14).

---

[55] At the second state habeas evidentiary hearing, defense counsel was questioned whether he thought the admission of Dr. Storms' testimony affected the jury.   He explained, "It was like getting hit in the head with a board.   I mean, it just was, it was just, it was like getting gutted."   (Doc. 56-10 at 24).

The jury was instructed that it could find the following statutory aggravating circumstances:   (1) that the murder was committed while the defendant was engaged in the commission of an aggravated battery; and/or (2) that the offense of murder was outrageously or wantonly vile, horrible or inhuman, in that it involved depravity of mind, torture to the victim prior to his death, or aggravated battery to the victim prior to his death. (Doc. 74-11 at 26-27).   The trial court instructed the jury:

> Depravity of mind is a reflection of an utterly corrupt, perverted, or immoral state of mind.   In determining whether the offense of murder in this case involved depravity of mind on the part of the defendant, you may consider the age and physical characteristics of the victim and you may consider the actions of the defendant prior to and after the commission of the murder.   In order to find that the offense of murder involved depravity of mind you must find that the defendant, as a result of utter corruption, perversion, or immorality, committed aggravated battery or torture upon a living person, or subjected the body of a deceased victim to mutilation.

(Doc. 74-11 at 28-29).   The jury imposed the death penalty after finding one statutory aggravating circumstance:   "The offense of murder was outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind."   (Doc. 70-5 at 25).

Dr. Storms' testimony that Hittson called Utterbeck an asshole and a hillbilly certainly helped the State prove depravity of mind.   The jury was instructed that they could consider Hittson's actions after the commission of the crime.   Dr. Storms' testimony was the only evidence that months after the crime, and with Vollmer completely out of the picture, Hittson possessed a "corrupt" or "immoral state of mind."   (Doc. 74-11 at 29).

Finally, and although the Court does not place great significance on this, there is some evidence that the jury struggled with its death sentence.   During sentencing phase deliberations, the jury sent two notes to the judge concerning the meaning of a life sentence. The first note asked the judge if a sentence of life imprisonment means "no opportunity for freedom from incarceration."   (Doc. 74-11 at 37).   The court responded with the pattern

charge that it had already given the jury:   "[A] 'life sentence' means [Hittson] would serve the remainder of his life in the penitentiary."   (Doc. 74-11 at 37-38).   Obviously dissatisfied with this answer, the jury asked if Hittson would ever be "eligible for parole or a reduced sentence on the basis of good behavior" if he was sentenced to life imprisonment.   (Doc. 74-11 at 39).   The court responded that it had answered this question in response to their first question.   Thus, there is good reason to believe the jury was looking for an alternative to the death sentence.

For these reasons, to the extent that the second state habeas court made a finding of fact when, without discussion, it found Dr. Storms' testimony to be only "minor evidence" in aggravation, Hittson has shown by clear and convincing evidence that this finding was clearly erroneous.   This Court cannot say, with fair assurance, that the jury's decision to sentence Hittson to death was not substantially swayed by the erroneous admission of Dr. Storms' testimony.   When the Court considers the admission of Storms' testimony in the context of the entire trial, it is apparent that his improperly admitted statement effectively undercut the defense's mitigation theory.   Affording the second state habeas court's order all appropriate deference, it is clear to this Court that the violation of Hittson's constitutional rights had a "'substantial and injurious effect or influence'" in the jury's determination to sentence Hittson to death.   *Brecht*, 507 U.S. at 637 (quoting *Kotteakos*, 328 U.S. at 776).

### C.  The Ineffective Assistance of Counsel Claims

"*Strickland*[56] is the touchstone for all ineffective assistance of counsel claims." *Blankenship v. Hall*, 542 F.3d 1253, 1272 (11th Cir. 2008).   To obtain relief for ineffective assistance of counsel, Hittson "must meet both the deficient performance and prejudice

---

[56] *Strickland v. Washington*, 466 U.S. 668 (1984).

prongs of *Strickland*."   *Id.* at 384.   To establish deficient performance, Hittson must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.   The Court must apply a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 689).   "To overcome that presumption, [Hittson] must show that counsel failed to act 'reasonabl[y] considering all of the circumstances.'"   *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (quoting *Strickland*, 466 U.S. at 688).   To establish prejudice, Hittson must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   *Strickland*, 466 U.S. at 694.   "A reasonable probability is a probability sufficient to undermine confidence in the outcome."   *Id.*

Hittson contends that, but for trial counsel's errors, he would not have received a death sentence.   To resolve this claim, the Court must "consider 'whether there is a reasonable probability that, absent the errors, the sentencer–including an appellate court, to the extent it independently reweighs the evidence–would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'"   *Newland v. Hall*, 527 F.3d 1162, 1184 (11th Cir. 2008) (quoting *Strickland*, 466 U.S. at 695).   When determining if prejudice exists, "it is necessary to consider *all* the relevant evidence that the jury would have had before it if [Hittson's counsel] had pursued the different path–not just the mitigation evidence [Hittson's counsel] could have presented, but also the [aggravating evidence] that almost certainly would have come in with it."   *Wong v. Belmontes,* 130 S. Ct. 383, at 386 (2009); *see also Porter v. McCollum*, 130 S. Ct. 447, 453-54 (2009).

Federal courts must "take a 'highly deferential' look at counsel's performance through the 'deferential lens of § 2254(d).'"   *Pinholster*, 131 S. Ct. at 1403 (quoting *Knowles v.*

*Mirzayance*, 556 U.S. 111, 121 n.2 (2009); *Strickland*, 466 U.S. at 689).   The Supreme

Court has explained that when the deference due under § 2254 combines with the

*Strickland* standard for assessing the performance of counsel, the result is a "doubly

deferential judicial review."   *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

### 1.  <u>Trial counsel's Investigation and Presentation of Mitigating Evidence</u>

Hittson essentially raises two claims regarding trial counsel and mitigating evidence.

First, Hittson claims trial counsel failed to investigate adequately "the mental health

mitigation case," and they failed to present the mental health evidence they had.   (Doc. 82

at 88).   Second, Hittson claims trial counsel failed to "meet their duty to introduce mitigating

mental health evidence in rebuttal to the damaging 'lay' testimony of Dr. Storms."   (Doc. 82

at 88).

It is appropriate to begin by noting two significant points.   First, the first state habeas

court, in a thorough and detailed opinion drafted by the court, rather than by counsel for the

Respondent, found that Hittson failed to prove his ineffective assistance of counsel claims.

(Doc. 76-4 at 2-22).   Hittson does not argue this order is not entitled to AEDPA deference.

Second, Hittson's trial counsel operated under highly unusual, for a capital case, time

constraints.   Hittson was indicted in June 1992.   The trial court appointed Walter

Sammons to represent Hittson shortly thereafter.   (Doc. 75-16 at 14).   Stephen Hollomon

was appointed in July 1992, and William Shurling was appointed in October 1992.   (Doc.

75-18 at 5; Doc. 75-17 at 27).   The State had the fruits of the Navy's extensive investigation,

a case on a "silver platter," as trial counsel put it, while Hittson's lawyers struggled to piece

together a defense that required travel to, and investigation in, four different states.   (Doc.

72-7 at 25).   After the trial court denied counsel's repeated requests, indeed pleas, for

continuances, trial began February 16, 1993.   (Doc. 72-7 at 8; Doc. 72-14 at 23-24; Doc.

72-15 at 13).

### a. Trial counsel's Investigation and the Decision Not to Present Expert testimony

#### (1) Performance

Trial counsel quickly realized that because of the strong evidence of Hittson's guilt,

which included his recorded confession, the "focus of the case really was ... the sentencing

phase."   (Doc. 75-16 at 72).   Sammons explained:

> [T]he theory of the case was that Mr. Vollmer had used and manipulated Mr.
> Hittson, and Mr. Hittson was a very emotionally needy, hungry person.   And
> our theory of mitigation was to develop that as much as we could and hope
> that the jury would be sympathetic to Mr. Hittson.

(Doc. 75-16 at 72).

To develop this theory, counsel met with Hittson on numerous occasions prior to the

trial.   (Doc. 75-16 at 72-73; Doc. 75-17 at 82-83).   Sammons travelled to Pensacola,

Florida, where the U.S.S. *Forrestal* was docked at the time, to interview numerous

shipmates and others who knew Hittson, Vollmer, and Utterbeck.   (Doc. 75-16 at 73-74).

When the U.S.S. *Forrestal* was docked in Philadelphia, Hollomon visited the ship to

interview additional sailors who knew the men.   (Doc. 75-16 at 73-74).   Both Sammons

and Hollomon travelled to Nebraska, where Hittson grew up, to interview Hittson's family

and another family, the Fletchers, who had "adopted" Hittson and treated him as part of their

family.   (Doc. 75-16 at 73).   While in Nebraska, counsel visited the schools that Hittson

attended and met "with as many teachers and counselors and people of that nature who

remembered him."   (Doc. 75-16 at 73; Doc. 75-17 at 91).   Sammons explained that they

"spent about two and a half days in Nebraska meeting with everybody [they] could who knew

him and remembered him."   (Doc. 75-16 at 73).   Hollomon testified that they also looked

for and obtained various records.   (Doc. 75-17 at 91-92).

Counsel recognized the need for mental health evidence and "were hopeful that it would be determined that [Hittson] was mentally retarded or that he had some sort of psychiatric condition that would truly render sympathy ... from the jury."   (Doc. 75-16 at 74). In an attempt to obtain this mitigation evidence, trial counsel arranged for Dr. Michael Prewett to examine Hittson.   (Doc 71-12 at 3; Doc. 75-16 at 36).   Trial counsel provided Dr. Prewitt with Hittson's medical records, clinical records from the Fremont Family Counseling Center and Immanuel Alcoholism Treatment Center, school records, and various letters written by Hittson.   (Doc. 75-18 at 12-13, 46-47).

Dr. Prewett found that Hittson scored in the low-average range of intellectual ability. (Doc. 74-8 at 38).   He opined that Hittson was a follower who "expressed a good deal of remorse and disbelief that he could have done something like this."   (Doc. 75-18 at 26). Dr. Prewett explained that he diagnosed Hittson as a "chronic alcoholic" who has a borderline personality disorder with "some schizoid features" and "mild brain dysfunction." (Doc. 75-18 at 21).   He explained the borderline personality disorder criteria that fit Hittson as follows:

> A pattern of unstable and intense interpersonal relationships characterized by alternating between extremes of idealization and devaluation.   That certainly fit the situation with Mr. Vollmer.   Identity disturbance, a markedly persistently unstable self image or sense of self, certainly that was the case.   Impulsivity in at least two areas that are potentially self damage (sic). The examples that are given are spending, sex, substance abuse, reckless driving, binge eating. Clearly he met that criteria.   Recurrent suicidal behavior or gestures or threats. There was some indication in the history of suicidal ideation.   Chronic feelings of emptiness would be one that he certainly experienced. Inappropriate intense anger, or difficulty controlling anger.   The examples that are given, frequent displays of temper, constant anger, recurrent physical fights.   He fought frequently in school, and certainly had some troubles controlling his anger.

(Doc. 75-18 at 23-24).

Dr. Prewett found that Hittson had mild brain damage, which "was fairly diffuse" and that was caused by a minor concussion or alcohol abuse.   (Doc. 75-18 at 44).   Dr. Prewett testified at the first state habeas evidentiary hearing that he informed counsel of all these findings prior to Hittson's trial.   (Doc. 75-18 at 26).   There is no evidence that trial counsel were unaware of any of Dr. Prewett's findings.

Based on Dr. Prewett's recommendation, trial counsel retained Dr. Norman Moore, a neuropsychiatrist, for further neurological studies.   (Doc. 75-18 at 17).   Dr. Moore reported that Hittson "tried to kill himself seven times," drank heavily at a young age, was arrested for stealing $1,500.00 from his father, and was later arrested for "burglary when he went into the wrong apartment."   (Doc. 75-20 at 38-39).   Dr. Moore found that Hittson "has a quick temper, but cools down quickly.   He does not get violent when sober but was always hostile and very violent on alcohol, especially liquor."   (Doc. 75-20 at 39).   Dr. Moore found that Hittson may have "suffered from Induced Psychotic Disorder (folie á deux)" at the time of the murder.   (Doc. 75-20 at 40).

> The central feature of this disorder is a delusional system that develops in a second person (Mr. Hittson) as a result of a close relationship with another person (the primary case, Mr. Vollmer) who already has a psychotic disorder with delusions. ...
>
> For Mr. Hittson to have the diagnosis of Induced Psychotic Disorder, Mr. Vollmer would have had to have had a psychotic disorder and been deluded at the time (for example that the murder victim intended to kill him and Mr. Hittson).   Even if Mr. Vollmer's belief did not reach delusional level, many of the other criteria were present.   Although the full syndrome may not have been present, it is my opinion that Mr. Hittson was unduly influenced by Mr. Vollmer.[57]

(Doc. 75-20 at 40).

------

[57]  Hittson points to this possible diagnosis as particularly mitigating.   However, both Dr. Moore and Dr. Prewett said that it would be impossible to confirm the diagnosis without evaluating Vollmer to determine whether he was delusional at the time and counsel had no way of forcing Vollmer to undergo a psychological evaluation.   Sammons also testified that neither Dr. Prewett nor Dr. Moore thought Hittson had this particular psychotic disorder.   (Doc. 75-16 at 123-24).

Although Dr. Moore provided some support, qualified though it was, for the theory that Vollmer manipulated Hittson, some of his findings were not helpful.   He diagnosed Hittson with alcohol abuse and antisocial personality disorder.   (Doc. 75-20 at 39).   Sammons testified that he met with Dr. Moore prior to trial and Dr. Moore told them that Hittson "was just mean," and "talked a lot about homosexuality."   (Doc. 75-16 at 100).   According to Sammons, Dr. Moore said "he felt like the crime had ... homosexual overtones." (Doc. 75-16).

Trial counsel also hired a social worker, Mary Shults.   (Doc. 75-16 at 41).   Shults interviewed Hittson, reviewed voluminous records, and travelled to Nebraska to interview Hittson's family, friends, and teachers.   She found that Hittson's family home was "cluttered, in disarray, and dirty" and that "[a]ll family members looked rather unkempt." (Doc. 75-20 at 6).   Hittson's family seemed unconcerned about his fate.   (Doc. 75-20 at 7). His father was an alcoholic who sometimes pulled Hittson "out of bed by his hair" and showed more interest in the family dogs than in Hittson.   (Doc. 75-20 at 8-9).   To fill the void created by his emotionally and physically neglectful parents, Hittson "latched on to Mr. and Mrs. Fletcher," the parents of his friend.   (Doc. 75-20 at 9).   Shults found that Hittson was subjected to ridicule and abuse among his peers because of poor personal hygiene and inappropriate clothes.   Shults opined that Hittson "suffered from emotional neglect by his [ineffective] parents," and was a "lost child in the family."   (Doc. 75-20 at 10).   Trial counsel were aware of Shults' findings and opinions prior to Hittson's sentencing hearing.   (Doc. 75-17 at 45).   At the first state habeas evidentiary hearing, Hittson did not present any new evidence that Shults failed to discover.   There is no evidence that trial counsel were unaware of any of Shults' findings.

On February 5, 1993, trial counsel filed a notice of their intent to raise an insanity or mental incompetence.   (Doc. 70-2 at 106).   The events that then occurred are discussed in detail above.   In brief, after Dr. Storms and Dr. Coplin evaluated Hittson, trial counsel attempted to get their reports but the trial court denied their request, ruling that the reports would be produced only if trial counsel elected to present expert testimony.   Sammons testified at the first state habeas hearing that he attempted to talk with Dr. Storms regarding his findings, but "Dr. Storms ... was just sort of noncommittal, [and] really didn't answer the question that I had."   (Doc. 75-16 at 34).   Trial counsel did not attend Dr. Coplin's examination and made no attempt to speak with him.   At the sentencing phase of the trial, counsel fought to keep Dr. Storms from testifying and yet still present their experts (except for Dr. Moore, whose involvement trial counsel successfully kept from the State).   After trial counsel proffered Dr. Prewett's testimony, counsel then requested Dr. Storms' and Dr. Coplin's reports and the trial court, over the State's objections, ordered the parties to exchange reports and the court provided the parties with Dr. Coplin's report.[58]   (Doc. 74-8 at 45-48).   Trial counsel and Dr. Prewett reviewed the reports during a thirty-minute recess.

After the recess, the Court ruled that if Hittson put up Dr. Prewett, the State could call Dr. Storms and Dr. Coplin.   (Doc. 74-8 at 49-50).   Trial counsel then proffered the testimony of Shults and argued that her testimony should not trigger rebuttal from Dr. Storms or Dr. Coplin because she was offering no diagnosis.   (Doc. 74-8 at 53-71).   The Court ruled that if she testified to any extent regarding Hittson's mental state, it would "open the door for the State to bring in [its] own expert witnesses as to ... [Hittson's] mental state." (Doc. 74-8 at 78).

---

[58] It does not appear that Dr. Prewett actually prepared a report, and the record does not show that trial counsel disclosed Dr. Moore's identity or his report.

After getting confirmation from the trial court that if they called no experts, the State's and the trial court's experts could not testify, trial counsel announced they would "just go with lay witnesses."   (Doc. 74-8 at 82).

Trial counsel then presented the testimony of twenty lay witnesses.   The first state habeas court found:

> These witnesses were discovered through trial counsel's visits to both Hittson's home in Nebraska, and the U.S.S. *Forrestal* ....   Through these witnesses trial counsel's goal was to show that Mr. Hittson was an impressionable, easily led, emotionally needy, and generally harmless guy, who was manipulated and controlled by Vollmer into doing something he would never normally have done.   They felt they were able to accomplish this goal.
>
> The witnesses from Nebraska were able to testify that [Hittson] was emotionally hungry and needy from an early age, and that he actually adopted another family because his own family was so cold and distant. The witnesses from the *Forrestal* were able to testify at length about Hittson, Vollmer, and their relationship.   More specifically, the Navy witnesses testified that Hittson was a very gullible, easily led individual who was constantly trying to fit in.   On the other hand, these witnesses testified that Vollmer was a very intelligent, manipulative and controlling individual, who liked playing with people's heads; who had spoken on occasion prior to the murder of "taking care" of the victim, implying danger to the victim; who subsequent to the murder discussed with people the best way to kill someone and dispose of the body; and who had, in a letter to an acquaintance, detailed a plan to kill his ex-girlfriend's then current boyfriend.   Lastly, these witnesses testified that in Vollmer and Hittson's relationship, Vollmer was the leader, Hittson was the follower, and that consequently, Hittson would do what Vollmer told him to do.

(Doc. 76-4 at 12-13).

Hittson claims that trial counsel's failure to introduce expert mitigation testimony was a "glaring omission" that occurred because of their "failure to adequately investigate the mental health mitigation case and find out what evidence was available to the [S]tate; [and] their failure to rationally assess the evidence once they were allowed to see the [S]tate's and Court's expert reports during a recess."   (Doc. 82 at 88).   The first state habeas court disagreed and held that "[i]n viewing counsel's actions in light of the totality of

circumstances, the Court concludes that trial counsel's decision not to present the testimony of Dr. Prewett and Ms. Shults was reasonable" and that Hittson was not prejudiced by this decision.   (Doc. 76-4 at 15, 21).   This Court agrees.

First, trial counsel conducted a detailed investigation into Hittson's background and employed at least three mental health professionals to assist them.   During the first state habeas evidentiary hearing, Hittson presented no mental health testimony or evidence that was not known to trial counsel prior to the sentencing hearing.   After conducting their investigation and reviewing reports from the State and court experts, trial counsel concluded that any advantage gained by presenting mental health evidence would be outweighed by the damage from the State's and the trial court's experts.   (Doc. 75-16 at 37-91; Doc. 75-17 at 39, 42-43; Doc. 75-18 at 92-92).   "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable…." *Strickland*, 466 U.S. at 690.

Moreover, the defense experts' conclusions were not completely favorable. Sammons testified that he "didn't think that what Dr. Prewett had to say would be mitigating, or in light of the other psychiatric evidence, would be given much weight."   (Doc. 75-16 at 37).   Although Dr. Prewett found some mild brain damage, he also admitted that "there would be people who had brain damage who wouldn't do what was done in this case." (Doc. 75-16 at 37).   Moreover, Dr. Prewett found Hittson's mild brain damage could have been caused by chronic heavy-drinking, a conclusion trial counsel did not think would be particularly helpful.   (Doc. 75-16 at 39).   Sammons explained that he did not "think that a jury would have looked at those photographs [of Utterbeck's mutilated body] and looked at what [Hittson] said he did and had any sympathy for him because he was an alcoholic." (Doc. 75-16 at 39-40).   Also, Dr. Prewett found that the borderline personality disorder from

which Hittson suffered was characterized, in part, by "[i]nappropriate intense anger, or difficulty controlling anger .... frequent displays of temper, constant anger, [and] recurrent physical fights."   (Doc. 75-18 at 23).   Dr. Prewett explained that Hittson "certainly had some troubles controlling his anger."   (Doc. 75-18 at 23-24).   Clearly, this was at odds with the non-violent image the defense sought to portray.[59]

With regard to Shults, Hollomon testified that had she "been able to testify without opening the door" to other experts, it would have benefited the defense.   (Doc. 75-17 at 45-46).   However, Sammons did not think her a "compelling witness;" she "was sort of overbearing."   (Doc. 75-16 at 125-26).   Similarly, Shurling testified that Shults was not a particularly "effective witness" and "might even possibly alienate some of the jurors."   (Doc. 75-18 at 115-16).   After the trial court ruled that her testimony might open the door to rebuttal by the State's mental health expert, trial counsel decided not to put her on the stand.

While Dr. Moore's report provided some helpful information, some of his findings, as noted, were harmful.   Hittson, Dr. Moore found, "has a quick temper" and "was always hostile and very violent on alcohol."   (Doc. 75-20 at 39).   His diagnosis was alcohol abuse and antisocial personality disorder.   "Evidence of drug and alcohol abuse is 'a two-edged sword,' and a lawyer may reasonably decide that it could hurt as much as help the defense." *Housel v. Head*, 238 F.3d 1289, 1296 (11th Cir. 2001) (citations omitted).   Moreover, the diagnosis of antisocial personality disorder can be "not mitigating but damaging." *Cummings v. Sec'y for the Dep't of Corr.*, 588 F.3d 1331, 1368 (11th Cir. 2009).

---

[59] Hittson maintains that Hollomon did not understand the nature of mitigating evidence in general and, specifically, did not understand that Dr. Prewett's diagnosis of "borderline personality disorder, schizoid personality features and neurological damage" could be mitigating.   (Doc. 82 at 124).   The record shows that all three attorneys understood the concept of mitigating evidence.   Also, they understood that they must consider the possible mitigating evidence along with all the other psychological evidence.   (Doc. 75-16 at 37-38; Doc. 75-17 at 39-43, 66-67; Doc. 75-18 at 91-92).

Then Dr. Moore told trial counsel that Hittson was "just mean" and obsessed with homosexuality.   (Doc. 75-16 at 100).   Sammons testified that following this meeting his "vote was to not put on any psychiatric or psychological testimony."   (Doc. 75-16 at 47). He was "scared to death that Dr. Moore's testimony would come in, that Dr. Prewett would testify that he had ... a consultation with Dr. Moore, and that Dr. Moore would have been called, and he was our psychiatrist, and he would have testified that [Hittson] was just mean."   (Doc. 75-16 at 102).

Hittson maintains that trial counsel misread or "fail[ed] to rationally assess" the reports from the State and court experts.   (Doc. 82 at 88).   These reports contained some mitigating information.   For example, Dr. Coplin's report stated that Hittson felt guilty, is "passive-dependent," blames himself for his problems, and is "guilt ridden." (Doc. 75-20 at 47-48).   However, his report said much that was unfavorable.   Dr. Coplin reported that Hittson started drinking and fighting at an early age; fought "a circle of students at one time;" had been arrested twice in the past; and that he had a "quick temper" but claimed to "cool down quickly."   (Doc. 75-20 at 42-44).   Dr. Coplin found that Hittson "does not show any psychiatric symptoms or psychiatric history that would render him not responsible for the charges against him;" "has no symptoms of psychosis at present or in the past"; and does not suffer from "any type of severe personality disorder."   (Doc. 75-20 at 44).   Dr. Coplin also reported that Hittson's MMPI personality profile showed "significant elevations" on "Scale 4 Psychopathic Deviant."   (Doc. 75-20 at 47).   Dr. Coplin ultimately diagnosed Hittson with alcoholism and Gasner syndrome, which is a "syndrome that is very common in patients who are undergoing possible life threatening charges against them or have committed very violent acts."   (Doc. 75-20 at 44-45).

Dr. Storms' findings were also problematic.   Unlike Dr. Prewett who found Hittson had a low average IQ and brain damage, Dr. Storms found he had a normal IQ of 105 and no brain damage.   (Doc. 70-4 at 18).   He also found that Hittson might be deliberately exaggerating his problems to some degree on one of the psychological tests.   (Doc. 70-4 at 18-19).   Dr. Storms opined that Hittson "led a passive-dependent life style overlayed on mild depression," and followed others, but did "act[] out, especially when he has been drinking."   (Doc. 70-4 at 20).   He explained that when Hittson "drinks his controls are loosened and a variety of acting out behaviors may occur."   (Doc. 70-4 at 21).   According to Dr. Storms, this would explain why several persons in the Navy "reported that they had seen Mr. Hittson become violent when he was intoxicated."   (Doc. 70-4 at 21).   Dr. Storms concluded that Hittson did not have a "disorder of thought or mood that would impair [his] ability to distinguish right from wrong with regards to the incident leading to his arrest." (Doc. 70-4 at 21).   Dr. Storms added that "even under ordinary circumstances, Mr. Hittson tends to act before he thinks. It is my opinion that alcohol exacerbated this natural style." (Doc. 70-4 at 21).

"'[W]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.'"   *Cook v. Warden, Ga. Diagnostic Prison*, 677 F.3d 1133, 1137 (11th Cir. 2012) (quoting *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc)).   As in *Cook,* trial counsel here made a strategic decision to forgo the presentation of expert testimony after the mental health evidence "revealed many pieces of potentially damaging evidence that could have been presented in rebuttal…."   *Id.*   Hittson's criticism of that decision calls to mind the Eleventh Circuit's recent observation "that, regardless of the mitigation strategy that capital defense lawyers choose, they are often 'damned if they do, and damned if they don't'" when they

decide to use, or not use, expert mental health testimony.   *Morton v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1157, 1161 (11th Cir. 2012).

Contrary to Hittson's implicit argument, there is no *per se* rule that expert mental health testimony must be presented.   Instead, counsel's duty at the penalty phase is to "investigate possible mitigating factors and make a reasonable effort to present mitigating evidence."   *Philmore v. McNeil*, 575 F.3d 1251, 1263 (11th Cir. 2009) (upholding state court decision that counsel was not ineffective for failing to present expert mental health testimony during the penalty phase of the trial); *see also Whisenhant v. Allen*, 556 F.3d 1198 (11th Cir. 2009).   Trial counsel did just that.   Their decision not to put Dr. Prewett and Shults on the stand was reasonable.   Indeed, trial counsel more likely would have been ineffective if they had opened the door to the damaging testimony of Dr. Coplin, Dr. Storms, and Dr. Moore.   Clearly, Hittson has not shown that the first state habeas court's decision involved an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts.

The first state habeas court also ruled that counsel was not ineffective for failing to speak with Dr. Coplin or obtain copies of Dr. Storms' and Dr. Coplin's reports prior to the sentencing hearing.   The first state habeas court found:

> Petitioner's main contention is that trial counsel did not adequately investigate the possible testimony of the court's expert, as they failed to discuss his findings with him prior to trial, although the trial court said such was permissible.   The factual basis for this argument is correct; however, the record reflects that trial counsel had about 30 minutes to review the Drs. (sic) reports.
>
> Petitioner argues that 30 minutes was insufficient time for trial counsel to properly review Dr. Coplin's report and to reach an informed decision. However, the Court believes 30 minutes to be sufficient time as the reports are not lengthy, and Dr. Coplin's report contains a summary which would make it possible to determine the substance of his testimony within that period of time.

Furthermore, trial counsel's decision not to present mental health expert testimony and the testimony of Mary Shults, was based not only on Dr. Coplin's report, but also on Dr. Storms and his report.   It is also important to note that trial counsel based their decision in part on negative comments on [Hittson's] disposition presented by Dr. Moore, which trial counsel obtained prior to trial.   As such, the Court finds unpersuasive Petitioner's argument that trial counsel's failure to attempt to determine what Coplin would say prior to trial caused them to make an uninformed and unreasonable decision concerning presentation of mental health evidence.

(Doc. 76-4 at 17).

The record fully supports this finding.   Clearly, trial counsel had no way to obtain Dr. Storms' and Dr. Coplin's reports prior to the sentencing hearing.   Trial counsel attempted to speak with Dr. Storms, but he refused to provide significant information.   (Doc. 75-16 at 34). Even if trial counsel had spoken with Dr. Coplin, there is no evidence that he would have told them anything different from the information contained in his report, most of which is more aggravating than mitigating for Hittson.

*Rompilla v. Beard*, 545 U.S. 374 (2005), provides no support for Hittson.   In *Rompilla*, counsel knew the State would attempt to establish the defendant's violent history by "proving [his] prior conviction for rape and assault, and would emphasize his violent character by introducing a transcript of the rape victim's testimony given in that earlier trial." *Rompilla*, 545 U.S. at 383.   Nevertheless, "defense counsel did not look at any part of that file, including the transcript, until warned by the prosecution a second time" the day before Rompilla's sentencing hearing.   *Id.* at 384.   Counsel then reviewed the transcript, but "none of the other material in the file."   *Id.* at 385.   The Supreme Court held that counsel was ineffective for failing to review the prosecutor's "readily available" file.   *Id.* at 385-86.

Here, as the first state habeas court made clear, Dr. Storms' and Dr. Coplin's reports were not "readily available."   *Id.* at 385; (Doc. 72-18 at 25-31, 41; Doc. 74-8 at 45-46). Applying the "doubly deferential judicial review" that this Court must to the first state habeas

court's opinion regarding trial counsel's performance, the Court finds that the decision is neither contrary to, nor an unreasonable application, of *Strickland*.   Nor was the court's decision based on an unreasonable determination of the facts.

### (2) Prejudice

The first state habeas court also found that Hittson was not prejudiced by defense counsel's failure to present mental health expert testimony.

> [I]n light of all of the evidence adduced, including the crime committed, the gruesome nature of that crime, [Hittson's] characterization of the victim after the crime, the mitigation evidence that was actually presented, and the possibly unfavorable psychological testimony which includes not only that which is described above, but the possibility of Dr. Moore, the defense's own expert, testifying that [Hittson] was "just mean," the Court does not believe there to be a reasonable probability that the jury would have returned with a sentence of life had Ms. Shults and Dr. Prewett been presented in the penalty phase. Accordingly, the Court concludes that Petitioner was not prejudiced by trial counsel's failure to present such evidence.

(Doc. 76-4 at 21).

To establish prejudice, Hittson must "establish 'a reasonable probability that a competent attorney, aware of [the available mitigating evidence], would have introduced it at sentencing' and 'that had the jury been confronted with this ... mitigating evidence, there is a reasonable probability that it would have returned a different sentence.'" *Wong*, 130 S. Ct. at 386 (quoting *Wiggins v. Smith*, 539 U.S. 510, 535-36 (2003)) (alterations in original).   The Court must "consider *all* the relevant evidence that the jury would have had before it," not just the mitigating evidence.   *Id.* (emphasis in original).

The twenty lay witnesses called by the defense supported trial counsel's mitigation theory:   "Hittson was an impressionable, easily led, emotionally needy, and generally harmless guy, who was manipulated and controlled by Vollmer into doing something he would never normally have done."   (Doc. 76-4 at 12).   They testified not just to their beliefs, but also "about things that he had done and g[a]ve ... anecdotal illustrations of his being

easily led, doing things to try to belong ... things of that nature, being easily manipulated."
(Doc. 75-16 at 108).   They testified that Vollmer was manipulative, controlling, intelligent,
had a morbid fascination with dead bodies, spoke of the best way to kill someone and
dispose of the remains, and had made detailed plans to kill the boyfriend of his ex-girlfriend.
Again, if trial counsel had called Dr. Prewett or Shults, they would have opened the door to
the negative testimony of Dr. Moore, Dr. Storms, and Dr. Coplin, which would have undercut
the lay witnesses' testimony for the defense.

It is clear that the first state habeas court analyzed the evidence presented at trial and
at the first state habeas proceedings when making its determination that Hittson had not
shown prejudice.   This Court finds that the first state habeas court's decision did not involve
an unreasonable application of *Strickland* and was not based on an unreasonable
determination of the facts.

### b.   Trial Counsel's Failure to Rebut Dr. Storms' Testimony

As discussed in detail above, one of Hittson's lay witnesses testified that Hittson
might have been remorseful.   In response, the trial court allowed the State to call Dr.
Storms as a lay witness to testify that Hittson called Utterbeck a "hillbilly" and an "asshole."
Defense counsel vigorously objected to this testimony, but did not rebut it.   Hittson argues
that "[t]his testimony was, by far, the most damaging psychological evidence available" and
once Dr. Storms testified, defense counsel had no reason not to call any or all of their mental
health experts.   (Doc. 82 at 99).   Hittson claims that counsel "had an affirmative duty at this
point to rebut Dr. Storms' testimony."   (Doc. 82 at 119).

The first state habeas court adjudicated this claim on the merits:

[Hittson] argues that the only damaging testimony that Dr. Storms could have
offered related to Hittson's statement that the victim was a "hillbilly" and an
"asshole," and once that testimony came in at the close of the State's rebuttal,
any basis for withholding psychiatric evidence disappeared. However, this

argument is unsupported by the record as it has been concluded that other portions of Dr. Storms' report, unrelated to Hittson's characterization of Utterbeck, could be construed as unfavorable. Furthermore, aside from Storms' report, presentation of Dr. Moore's unfavorable testimony would still have been a possibility.

Accordingly, trial counsel's failure to present Dr. Prewett and Ms. Shults' testimony, subsequent to the rebuttal testimony of Dr. Storms, should be considered reasonable.   Furthermore, even if it could be considered unreasonable, [Hittson] was not prejudiced by trial counsel's failure to present such testimony.   Accordingly, trial counsel was not ineffective for failing to present the testimony of Dr. Prewett and Ms. Shults, subsequent to Dr. Storms' testimony in rebuttal.

(Doc 76-4 at 21-22).

This finding is supported by the record.   As Hittson points out, trial counsel were, understandably, surprised[60] when the trial court allowed Dr. Storms to testify.   (Doc. 75-16 at 49).   Hollomon admitted that when the trial court allowed Dr. Storms to testify, he was "not sure any of us really knew what to do."   (Doc. 75-17 at 62).   However, Hollomon also said he thought they "may have talked about putting up Dr. Prewett, but [he] didn't ... see the value of doing that."   (Doc. 75-17 at 59).   Trial counsel were still concerned that they would open the door to expert testimony.   Sammons testified that even after Dr. Storms' testimony, he still was convinced calling Dr. Prewett and Ms. Shults would be a mistake.

> Q. At the moment after [Dr. Storms' testimony was presented], did you change your decision about putting up Dr. Prewett or Ms. Shults?
> A. No.
> Q. Did you even think about it?
> A. I don't recall whether we thought about it or talked about it.   But I can tell you, prior to trial, because of what Dr. Moore had to say, I was committed to

---

[60] Hittson cites *Gray v. Netherland*, 518 U.S. 152, 169 (1996) for the proposition that when counsel is "'confronted and surprised'" by the testimony of a witness, they are "under an obligation to ask for a continuance, as well as for exclusion of the testimony."   (Doc. 82 at 136).   *Gray* dealt with a notice-of-evidence claim under the due process clause.   Ineffective assistance of counsel was not an issue and the Court did not make this statement even in *dicta*.   The United States Supreme Court held that for Gray to prevail on his notice-of-evidence claim, he would have to establish not only that due process requires he receive more than a day's notice of the State's evidence, but also that due process requires either (1) he receive a continuance regardless of whether he moves for one or (2) if he chooses not to seek a continuance, that exclusion is the only remedy for inadequate notice.   The Court denied relief because Gray could prevail only with the adoption of a new constitutional rule.   This holding is completely inapplicable.

not having all that come up.
       Q. And that commitment never changed, even after Dr. Storms got up
and testified?
       A. Not for me.

(Doc. 75-16 at 49-50).

     As harmful as Dr. Storms' testimony was, trial counsel reasonably thought that their

lay witnesses had demonstrated

> that [Hittson] was ... pretty impressionable, and that ... away from the
> co-defendant, he was a pretty harmless guy ... [who] drank a lot, but, basically,
> he was sort of a needy kind of harmless little guy, and that Mr. Vollmer was the
> brains of this operation and basically manipulated [Hittson] into doing
> something that he would have never done.

(Doc. 75-17 at 61-62).   Had trial counsel cross-examined Dr. Storms[61] or called Dr.

Prewett or Ms. Shults after Storms' testified, they likely would have opened the door

to testimony that had the potential of undoing the defense's entire mitigation case.

For example, the jury could have heard that Hittson was not harmless and nonviolent.

Rather, he was "mean," liked to fight, "acts out," and becomes hostile and violent

when he drinks alcohol.   (Doc. 70-4 at 20; Doc. 75-16 at 100-01, Doc. 75-20 at

39-40).   The jury could have learned that, contrary to the lay witness testimony,

Hittson was not a "slow" or "stupid" person, nor was he naïve or gullible.   Rather, he

had an average IQ of 105, and he was a deceptive person who attempted to

exaggerate his psychological problems.   (Doc. 70-4 at 18-19).

---

[61]   It is unclear if Hittson could have introduced Dr. Storms' mental health report and cross-examined Dr.
Storms, who was not testifying as a mental health expert, without placing his mental health into issue and
opening the door to additional expert mental health testimony.   Hittson complains that counsel did not "stem
the damage caused by Storms' testimony by simply cross-examining him and eliciting from him the other
information available in the report—that Mr. Hittson had no enmity or intense feelings toward Mr. Utterbeck."
(Doc. 82. at 135).   Storms' report does show that "there was no apparent intense feeling one way or the other
between Mr. Hittson and his alleged victim."   (Doc. 70-4 at 18).   The Court agrees with the Respondent that
this finding does not establish that Hittson felt any remorse and might actually have been used against him.
The State could have argued that Hittson beat with a baseball bat, shot in the forehead, dismembered, and
mutilated Utterbeck, who was not someone he hated, but someone he had absolutely no intense feelings for
"one way or the other." (Doc. 70-4 at 18; Doc. 83 at 136).   Such an assertion would emphasize the cold,
heartless nature of this crime.

Given these facts, the first state habeas court's decision that counsel was not ineffective for failing to rebut the testimony of Dr. Storms, and, in any event, that Hittson was not prejudiced, is not contrary to, nor does it involve an unreasonable application of, *Strickland*.   Further, the court's decision was not based on an unreasonable determination of facts in light of the evidence presented.

## 2.   Trial Counsel's Failure to Call Hittson

Hittson maintains that

> [his] attorneys ... acted unreasonably by failing to discuss with [him] ahead of trial whether or not it would be advisable to testify in his own defense.   This omission was made worse by the fact that, at the time of this crucial decision which occurred immediately before [he] would have been called to testify, counsel could not agree amongst themselves what [he] should do.

(Doc. 82 at 141).

The first state habeas court adjudicated this claim on the merits.   After discussing the applicable law and making numerous findings of fact, the state habeas court held:

> In sum, the record indicates that counsel advised [Hittson] that he had a right to testify and the decision of whether to testify or not was [Hittson's] to make. Further, the record indicates that [Hittson] was advised of the strategic implication of each choice he could make, not only some time prior to his decision, but moments before.   The record also indicates that after being advised of all of this, and after discussion between counsel which occurred in front of [Hittson] moments before he was to make his choice, trial counsel agreed that [Hittson] should not testify.   Consequently, [Hittson] decided not to testify and this decision was communicated to trial counsel by [Hittson] on the record.
>
> In light of this evidence the Court concludes that trial counsel, in assisting [Hittson] in deciding whether to waive his right to testify, acted within the wide range of competence demanded of attorneys in criminal cases and their actions or inactions did not deprive [Hittson] of the ability to choose whether or not to testify on his own behalf.

(Doc. 76-4 at 27).

In *United States v. Teague*, 953 F.2d 1525 (11th Cir. 1992), the Eleventh Circuit explained that "[b]ecause it is primarily the responsibility of defense counsel to advise the

defendant of his right to testify and thereby to ensure that the right is protected, we believe the appropriate vehicle for claims that the defendant's right to testify was violated by defense counsel is a claim of ineffective assistance of counsel under [*Strickland*]."   *Id.* at 1534. Furthermore, "[d]efense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide."   *Id.* at 1533.   The first state habeas court found that trial counsel fulfilled all these requirements, and, thus their performance was not deficient.   This Court agrees.

Hittson maintains that "[c]ounsel took no steps to prepare him for what the experience of testifying might be like if he chose to testify, nor did they tell him that it was his decision alone whether or not to testify."   (Doc. 82 at 146).   He alleges that counsel did not investigate whether he should or should not testify before they made a strategic recommendation to him on the issue.   Accordingly, he states that the first state habeas court's findings to the contrary constitute unreasonable findings of fact.   (Doc. 82 at 147).

The record does not support Hittson's contentions.   Well before the mitigation phase of his trial, both Sammons and Hollomon discussed with Hittson whether he should testify in the sentencing phase of his trial.   Sammons testified:

> The way that I prepare a witness is to just sort of go through their testimony, to ask them questions and elicit their answers. And I met with [Hittson] repeatedly and done (sic) that, and he had on different occasions said wildly different things about what happened in regard to the mutilation of the body.   So I never sat down and said, okay, you are going to testify, let's go through it. You know, now, so in that sense, I did not prepare him to testify.   But in the other sense, ... I spent an awful lot of time trying to get a grip on whether or not he could or should testify. ...
>
> I told him that he had the right to testify if he wanted to, but that my opinion was that he could not help himself, and that he should not testify.

(Doc. 75-16 at 54-55).

Similarly, Hollomon testified that he met with Hittson many times and:

> Hittson changed a lot of the facts that he had given with respect to his participation in these events over the time that we had talked with him.   And it seemed that Mr. Hittson was adding things that he did, and that it was a pretty gruesome factual case and [we] didn't really want that, didn't really look forward to the District Attorney cross examining him on ... things that occurred during the event.   And that would have been especially true if Mr. Hittson had indicated that he had done things in addition to what he had admitted having done on the tape that was originally made of his confession.

(Doc. 75-17 at 49-50).

After the lay witnesses testified during the mitigation phase of trial, trial counsel again discussed whether Hittson should testify.   Both Sammons and Hollomon continued to feel strongly that Hittson should not testify.   While Shurling acknowledged that their concerns were legitimate, he testified that as "a personal rule" he would prefer a defendant to testify if at all possible.   (Doc. 75-18 at 95, 97).   Both of these positions were presented to Hittson before he made the final determination not to testify.   Sammons advised Hittson that, in his opinion, "the lay testimony had gone real well" and that Hittson may face difficulty during the cross-examination.   (Doc. 75-16 at 129-30).   He explained to Hittson that the ultimate decision to testify or not was his and that the judge would tell the jury that they could not hold his failure to testify against him.   (Doc. 75-16 at 129-31).   Shurling testified that Sammons and Hollomon explained to Hittson "in detail the reasons why they didn't think he should testify."   (Doc. 75-18 at 101).   Shurling too discussed with Hittson the potential benefits and drawbacks of testifying, and they all made clear to "Hittson that it was ultimately his choice whether to testify."   (Doc. 75-18 at 102).[62]

---

[62] Following the lay witness testimony, the judge asked Hittson whether he understood that he "did have the right to testify."   Hittson responded that he did.   The judge then asked him if he was "electing not to testify."   Hittson responded that he was.   (Doc. 74-10 at 46).   After Dr. Storms' testimony, the judge explained that he heard Hittson might want to testify and then heard that "upon further reflection ... he changed his mind."   When the judge questioned Hittson if this was correct, he said it was.   (Doc. 74-10 at 81).

Hittson now alleges that throughout the trial there was friction among trial counsel about whether he should testify.   (Doc. 82 at 146).   Hittson claims that "[t]he difference of opinion between counsel was so pronounced that Sammons was 'concerned that Mr. Shurling and Mr. Hollomon were going to get into a fight.'" (Doc. 82 at 146) (quoting Doc. 75-16 at 67).   Hittson testified that Hollomon and Sammons told him that if he "decided to testify ...   they were going to go to the Judge and going to write something and say that they had advised [him] not to."   (Doc. 75-18 at 84).   According to Hittson, "[u]nder these conditions, it cannot be said that [he] made a knowing and voluntary waiver of his right to testify at the sentencing phase of his case."   (Doc. 82 at 147).

Again, the record does not support Hittson's contentions.   While Sammons testified he "was concerned that Mr. Shurling and Mr. Hollomon were going to get into a fight," he immediately qualified his testimony:   "[T]hey didn't get into a fight.   I don't know that they even got into an argument."   (Doc. 75-16 at 67).   Shurling described the same meeting as "very professional" and all three attorneys testified that at no time did Hollomon raise his voice to Shurling.   (Doc. 75-17 at 4; Doc. 75-18 at 102).   Shurling explained:   "[I]t did not seem like an argument. ... It was a professional discussion. ... [I]t was logical, it was calm, and it was matter of fact.   Various reasons for it, various reasons against the fact that they didn't feel like he should testify."   (Doc. 75-18 at 102).   Hittson himself explained that "they were debating back and forth."   (Doc. 75-18 at 83).   Shurling testified that following this discussion, he communicated to Hittson again that the ultimate decision was his.   (Doc. 75-18 at 96).

The state habeas court found no merit to Hittson's argument that he was coerced into waiving his rights to testify when his counsel threatened to go to the judge and inform him that they had advised Hittson not to testify.   (Doc. 76-4 at 22-23).   The court found: "This

allegation is supported only by [Hittson's] testimony.   Neither Mr. Sammons, nor Mr. Hollomon testified as to whether this occurred or not, and Mr. Shurling provided unsolicited testimony that he does not recall that happening.   Accordingly the Court finds there to be insufficient evidence to support such an allegation."   (Doc. 76-4 at 22-23).

Hittson has not shown by clear and convincing evidence that these factual findings are unreasonable.   *See Consalvo*, 664 F.3d at 845 (explaining that "[d]etermining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review" and questions of credibility are questions of fact that are accorded a presumption of correctness that must be overcome by clear and convincing evidence).

The first state habeas court also rejected Hittson's claim that he suffered prejudice because his lawyers failed to put him on the stand.   According to Hittson, there is a reasonable probability that the result of the proceedings would have been different had he taken the stand.   Other than these conclusory allegations contained in one paragraph of Hittson's brief, Hittson provides no factual support and no cites to the record to support this contention.   The Court, therefore, finds that Hittson has not shown the state habeas court's decision regarding the lack of prejudice is contrary to, or involved an unreasonable application of, *Strickland*.   Nor has he made any showing, much less by clear and convincing evidence, that the state court's finding was based on an unreasonable determination of facts.

### D.  Hittson's Request for Proportionality Review

The Georgia Supreme Court ruled on Hittson's proportionality claim:

Hittson complains that his sentence of death is disproportionate to the life sentence given Edward Vollmer, his co-defendant.   In his statement to law enforcement officers Hittson admitted striking the victim with a baseball bat, taking a gun Vollmer offered him, and shooting the victim in the head.   Hittson

assisted Vollmer in dismembering and burying the body, as well as concealing the crimes.   Given Hittson's degree of participation in the crimes, we are unable to say that his sentence of death is disproportionate to Vollmer's life sentence. ...

The evidence supports the jury's finding of the (b)(7) aggravating circumstance.   We conclude that Hittson's sentence was not imposed as the result of passion, prejudice or other arbitrary factor.   Hittson's death sentence is neither excessive nor disproportionate to penalties imposed in similar cases, considering both the crime and the defendant. The cases listed in the Appendix support the imposition of a death sentence in this case.

*Hittson*, 264 Ga. at 688, 690, 449 S.E.2d at 594, 596 (internal citations omitted).

Hittson raised a proportionality claim again in his second state habeas corpus petition and the second state habeas court held:

This Court finds that [Hittson's claim that his death sentence is disproportionate punishment] is successive as not only <u>could</u> [Hittson] pursue this claim on appeal, [Hittson] <u>did</u> pursue this claim on appeal, and the Georgia Supreme Court rejected this claim . ... Thus, this claim is barred under the doctrine of *res judicata* and not reviewable by this Court. ...   Further [Hittson] has not shown a substantial denial of constitutional rights to warrant relief as a miscarriage of justice.

Alternatively, the Court finds that [Hittson] has not shown any substantive change in facts or law that would warrant a repeated proportionality review of this sentence.

(Doc. 63-1 at 50).

Hittson alleges that the proportionality review conducted by the Georgia Supreme Court no longer protects "against the 'wanton' and 'freakish' imposition of the death penalty." (Doc. 82 at 150) (quoting *Furman v. Georgia*, 408 U.S. 238, 313 (1972) (White, J., concurring)).   Specifically, he alleges that the "[p]roportionality review as currently administered by the Georgia Supreme Court is constitutionally deficient because the state court fails to consider capital cases in which life sentences were imposed alongside cases in which death sentences were imposed when determining the proportionality of the sentence." (Doc. 82 at 153).   He also claims that the second state habeas court's decision that his

claim is barred by res judicata is incorrect.

The short answer to this claim is that there is no constitutional right to proportionality review.   Neither *Gregg v. Georgia,* 428 U.S. 153 (1976), nor any cases that have followed, have held that Georgia courts must conduct any proportionality review.   In fact, the United States Supreme Court has held that it would be error to conclude "that *Gregg* required proportionality review."   *Pulley v. Harris*, 465 U.S. 37, 46 (1984).   The Eleventh Circuit has specifically "instructed district courts to refuse such requests when deciding habeas corpus petitions."   *Mills v. Singletary*, 161 F.3d 1273, 1282 (11th Cir. 1998).   In *Moore v. Balkcom*, 716 F.2d 1511, 1518 (11th Cir. 1983), the Eleventh Court held:

> A federal habeas court should not undertake a review of the state supreme court's proportionality review and, in effect, "get out the record" to see if the state court's findings of fact, their conclusion based on a review of similar cases, was supported by the "evidence" in the similar cases.   To do so would thrust the federal judiciary into the substantive policy making area of the state. It is the state's responsibility to determine the procedure to be used, if any, in sentencing a criminal to death.

Hittson also claims, without citation to precedent that would allow such, that this Court should conduct a second proportionality review because the Georgia Supreme Court did not know that both the District Attorney and lead investigator considered Vollmer to be the instigator of the murder.   The second state habeas court considered this claim and held that Hittson did not show any substantive change in facts or law that would warrant a repeated proportionality review.

While the lead investigator did testify that Vollmer was the instigator, he also explained that Hittson hit Utterbeck in the head with an aluminum baseball bat, drug him into the kitchen, and "looking straight at him," shot him in the forehead as Utterbeck pleaded for his life.   (Doc. 56-11 at 66).   Also, the District Attorney testified that while he believed Vollmer was evil and was the instigator:

It was Mr. Hittson who swung the bat and got Mr. Utterbeck basically groggy or
dazed or semi-conscious, and it was Mr. Hittson who put the gun between his
eyes and blew his brains out.   And so with that, that is the stronger case, from
a factual standpoint that's a stronger case.

(Doc. 56-11 at 148).


These are the same facts on which the Georgia Supreme Court relied when it

determined that "[g]iven Hittson's degree of participation in the crimes," his sentence is not

disproportionate to Vollmer's life sentence.   *Hittson*, 264 Ga. at 688, 449 S.E.2d at 594.

Thus, Hittson has not shown that the second state habeas court's decision that a second

proportionality review was unnecessary was based on an unreasonable determination of the

facts.   Moreover, as explained above, this Court has no authority to conduct a

proportionality review.

## IV.   CONCLUSION

The Court finds that Hittson is entitled to habeas relief on Claim One and Claim Two

in his Amended Petition for Writ of Habeas Corpus:   The admission of Dr. Storms'

testimony violated Hittson's Fifth Amendment privilege against self-incrimination and Sixth

Amendment right to counsel.   All remaining claims are denied and any of Hittson's

allegations not specifically addressed herein are determined to be without merit.

## V.   CERTIFICATE OF APPEALABILITY

A prisoner seeking to appeal a district court's final order denying his petition for writ of

habeas corpus has no absolute entitlement to appeal but must obtain a Certificate of

Appealability ("COA").   28 U.S.C. § 2253(c)(1)(A).   As amended effective December 1,

2009, Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District

Courts provides that "[t]he district court must issue or deny a [COA] when it enters a final

order adverse to the applicant," and if a COA is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."

The Court can issue a COA only if the petitioner "has made a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2).   To merit a COA, the Court must determine "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"   *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citations omitted).   If a procedural ruling is involved, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."   *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Under this standard, the Court issues a COA on the following issue:   Whether Hittson was denied his right to a fair trial and reliable sentencing, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, due to the State's failure to disclose Vollmer's psychiatric report and Vollmer's post-arrest letters.[63] (Doc. 45 at 99-111).

In relation to all other claims, grounds, and issues raised in Hittson's Amended Petition for Writ of Habeas Corpus (Doc. 45), the Court finds that the standard shown above for the grant of a COA has not been met.

---

63 This issue is part of Claim Thirteen in Hittson's Amended Petition for Writ of Habeas Corpus. (Doc. 45 at 99-111).

Accordingly, it is hereby Ordered as follows:

(1) The Amended Petition for Writ of Habeas Corpus filed by Travis Clinton Hittson (Doc. 45) is **GRANTED** in part and **DENIED** in part.

(2) Claims Three through Twenty in the Amended Petition for Writ of Habeas Corpus are **DENIED** with prejudice.

(3) The Writ of Habeas Corpus shall issue on Claims One and Two only, and the death sentence entered in Case No. 92-C-18076-M in the Superior Court of Houston County, Georgia, is **VACATED** and the State of Georgia shall, within a reasonable time, decide to hold a new sentencing hearing or impose a lesser sentence consistent with the law.

(4) A COA is issued only for Hittson's claim that his right to a fair trial and reliable sentencing, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, was denied due to the State's failure to disclose Vollmer's psychiatric report and Vollmer's post arrest letters.   (Doc. 45 at 99-111).

(5) The effect of this Order will be automatically stayed pending resolution of any appeal taken to the Eleventh Circuit Court of Appeals.

(6) The Clerk of Court is directed to enter judgment and close the case.


   **SO ORDERED**, this 13th day of November, 2012.


                        S/ Marc T. Treadwell
                        MARC T. TREADWELL, JUDGE
                        UNITED STATES DISTRICT COURT


lnb